Doyle LANDERS, Employee/Respondent,

v.

CHRYSLER CORPORATION,
Employer/Self–Insured/Appellant.

No. 72028.

Missouri Court of Appeals,
Eastern District,
Division Two.

Dec. 9, 1997.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 9, 1998.

Application for Transfer Denied
March 24, 1998.

Paul D. Larimore, St. Louis, for appellant.

John D. Schneider, St. Louis, for respondent.

D. Scott Barash, Washington, D.C., Daniel P. Card, St. Louis, James L. McHugh, Jr., Washington, D.C., Amici Curiae, for respondent.

RHODES RUSSELL, Judge.

Chrysler Corporation ("employer") appeals from a final award of 50% permanent partial disability and future medical care entered by the Labor and Industrial Relations Commission ("Commission"). The issues on appeal are 1) whether the psychologist was competent to testify regarding the causal relationship between Doyle Landers' ("claimant") brain deficits and his industrial accident; 2) whether there was competent and substantial evidence to support the Commission's award of future medical care; and, 3) whether there was competent and substantial evidence to support the award of 50% permanent partial disability. We affirm.

The evidence reflects that claimant, an auto worker, was injured on September 13, 1989, in a work-related accident. On the date of the accident, claimant was hit on the top of the head by a skyhook while loading engines at employer's plant. Upon being struck, claimant fell to his knees. Claimant remembered going to his knees, but other than what he was told by his fellow employees, he could not recall much. Claimant was treated at the employer's dispensary shortly after the accident. The dispensary records indicate that claimant had a wobbly gait, was complaining of tingling sensations in his extremities, seemed dazed with complaints of neck pain, had blurred vision, and had difficulty remembering his department and home phone number.

Claimant's neck was immobilized and he was conveyed to St. Joseph's Hospital where he was admitted for seven days. The admitting physician diagnosed claimant as having a cerebral concussion with post concussion syndrome and a scalp laceration. Dr. David Wilkinson, a neurosurgeon, concluded that claimant had sustained a concussion. Dr. Wilkinson noted that a CT scan of claimant's head appeared to be normal. Dr. Wilkinson's admission note stated that claimant was admitted primarily for observation and treatment for a cerebral concussion and possible cord contusion.

Claimant was examined by Dr. Wilkinson on September 14, 1989. At that time, he was complaining of headache, photophobia, ataxia, scotomata, and vertigo. A MRI scan of claimant's brain was performed and was interpreted as being within normal limits. Dr. Wilkinson's final diagnosis was that claimant had a cerebral concussion, post concussion syndrome, cervical sprain with cervical spur, and a scalp laceration. Claimant was subsequently discharged from the hospital on September 20, 1989.

On September 29, 1989, claimant saw Dr. Wilkinson for a follow-up examination. Dr. Wilkinson found claimant totally incapacitated for an indefinite period of time and directed that claimant remain off work.

Following his appointment with Dr. Wilkinson, employer's claim's manager referred claimant to Dr. Patrick Hogan. On October 4, 1989, Dr. Hogan performed a neurological examination of claimant. Claimant informed Dr. Hogan that since his accident he had headaches, felt dizzy three to four times a day, and bright lights bothered his eyes.

After completing the examination, Dr. Hogan's diagnosis was head injury, with complications of headaches and light-headedness. Dr. Hogan noted that the CT scan of claimant's head was normal.

After returning back to work on October 17, 1989, claimant complained of headaches, nausea, vomiting, photophobia, and ataxia. On October 25, 1989, claimant reported to the dispensary complaining of dizziness. The dispensary records indicated that claimant was slurring his words and that his response to questions was slow.

Following the accident and his return to work, claimant stated that he suffered from nervousness, anxiety, depression, loss of concentration, and headaches. Fellow employees reported that after the accident, claimant could not keep up on his job, seemed confused, and missed a lot. of operations. After the accident, claimant was putting the wrong engine on the line three to four times a day. Claimant's co-workers stated that they worked to catch his mistakes and to cover for him before his supervisor caught him. Other employees stated that after the accident claimant's speech was slower and it was difficult to carry on a conversation with him.

Claimant's wife testified that after the accident claimant could not think of words and was slow to express himself. She stated that claimant suffered from headaches and would keep to himself in a dark room. Claimant's wife stated that after the accident claimant would get very angry over nothing and would exhibit "Dr. Jekyll and Mr. Hyde" mood swings. She noted that claimant's family and friends would not come around anymore because of his temper.

Based on these complaints, claimant was referred by his attorney to see Dr. Thomas Fitzgerald, a clinical psychologist. In September and October of 1990, Dr. Fitzgerald performed a series of neuropsychological tests on claimant. Based on these tests, Dr. Fitzgerald concluded that claimant sustained a closed head injury which resulted in impaired retention and memory, poor concentration and attention, inability to sequence, and emotional liability and fatiguability. It was Dr. Fitzgerald's opinion that if claimant ever lost his present job he would not be employable on the open and competitive labor market because of the above mentioned deficits. Dr. Fitzgerald opined that claimant sustained a 75–80% permanent partial disability as a result of the head injury sustained in his work-related accident.

Claimant was also examined by Dr. Richard Wetzel, a clinical psychologist who practiced neuropsychology. Dr. Wetzel examined claimant in June of 1992, and reexamined him on September 5, 1995. Dr. Wetzel performed a battery of cognitive tests including intelligence tests, memory tests, tests for concentration and attention, tests for verbal skills, and tests for visual perceptual abilities. Based on the results of these tests and interviews with claimant and his wife, Dr. Wetzel concluded that claimant had sustained brain dysfunction and depression as a result of the blow to his head on September 13, 1989. Dr. Wetzel diagnosed claimant as having a lesion in his brain as a result of the accident. Dr. Wetzel found that claimant had cognitive deficits that affected his ability to attend what he was doing or saying, to learn or remember, to communicate with others, and to control his emotional reaction to others. Based on his testing, Dr. Wetzel concluded that claimant was 75% disabled in his body as a whole as a result of the cognitive impairments caused by the blow to his head.

Dr. Hogan and Dr. Wayne Stillings, on behalf of employer, rendered opinions. Dr. Hogan opined that claimant did not suffer a concussion as a result of his accident on September 13, 1989, and that claimant's complaints of loss of memory and concentration, inability to express himself, and depression were not the result of the accident. It was Dr. Hogan's opinion that claimant had a 5–8% permanent partial disability based upon claimant's subjective complaints. According to Dr. Hogan, claimant's injury in no way prohibited him from performing any or all work duties which he was qualified for, without limitation or restriction. Dr. Hogan opined that claimant would not need further medical treatment as a result of the accident based upon the negative neurological examinations and the fact that claimant was able to perform his duties for two years following his accident.

Dr. Stillings examined claimant on behalf of employer and determined that claimant did not suffer a concussion nor a permanent brain injury. Dr. Stillings also determined that claimant did not suffer any psychological injury and that claimant did not need any psychiatric treatment as a result of the accident. Based on his examination, Dr. Stillings concluded that claimant sustained a 0% permanent partial disability as a result of the accident.

Hearings were held before an administrative law judge ("ALJ"). The ALJ issued findings of fact and rulings of law on November 2, 1995, concluding that claimant's complaints of memory loss, inability to perform his job properly, personality changes, concentration problems, speech problems, and depression were causally related to the work-related injury on September 13, 1989. The ALJ found that claimant sustained a 50% permanent partial disability measured at the level of the body as a whole as a result of the work-related injury. The ALJ also determined that claimant was entitled to future medical care to cure and relieve the continuing depression brought about as the result of the accident.

Employer filed an application for review with the Commission. The Commission entered a final award affirming the award of the ALJ. This appeal follows.

■ In its first point, employer argues that the Commission erred as a matter of law in ruling that claimant's alleged brain deficits were medically causally related to his September 13, 1989 accident. Employer contends that this ruling is not supported by any competent or substantial evidence in that the only evidence presented by claimant regarding causation was that of two clinical psychologists. Employer maintains that the psychologists, since they were not medical doctors, were not competent or qualified to render an opinion regarding whether claimant's alleged brain deficits were medically-causally related to his accident. According to employer, since the clinical psychologists were not competent to testify regarding causation, the only competent evidence in the

record demonstrates that claimant suffered no brain injury or post-concussion syndrome as a result of his accident, which could account for his current complaints. We disagree.

■ The standard of review in a worker's compensation case is set forth in section 287.495, RSMo 1994.[1] In determining the sufficiency of the evidence in a worker's compensation case, we review the evidence and inferences in the light most favorable to the Commission's award. *Silman v. William Montgomery & Associates,* 891 S.W.2d 173, 175 (Mo.App.1995). We will overturn the Commission's decision only if it is unsupported by substantial evidence or clearly contrary to the overwhelming weight of the evidence. *Duncan v. Springfield R–12 School District,* 897 S.W.2d 108, 113 (Mo.App.1995). We disregard any evidence which might support a finding different from the Commission's even though the evidence may have been sufficient to support contrary findings. *Eimer v. Board of Police Commissioners,* 895 S.W.2d 117, 120 (Mo.App.1995). We review questions of law, however, independently. *West v. Posten Construction Co.,* 804 S.W.2d 743, 744 (Mo. banc 1991).

■ A worker's compensation claimant bears the burden of proving an accident occurred and it resulted in injury. *Silman,* 891 S.W.2d at 175. For an injury to be compensable, the evidence must establish a causal connection between the accident and the injury. *Id.* The testimony of a lay witness can constitute substantial evidence of the nature, cause, and extent of disability when the facts fall within the realm of lay understanding. *Id.* An injury, however, may be of such a nature that expert opinion is necessary to show that it was caused by the accident to which it is assigned. *Id.* Medical causation, which is not within the common knowledge or experience of lay understanding, must be established by scientific or medical evidence showing the cause and effect relationship between the complained of condition and the asserted cause. *McGrath v. Satellite Sprinkler Systems,* 877 S.W.2d 704, 708 (Mo.App. 1994). Proper opinion testimony as to causal

1. All references are to RSMo 1994 unless otherwise indicated.

connection is competent and can constitute substantial evidence. *Silman*, 891 S.W.2d at 176.

■ The central issue in this case is whether a neuropsychologist is qualified to testify as to causation of an organic brain injury. This issue appears to be one of first impression in this state. In other jurisdictions which have considered this similar issue, the courts have split.

The jurisdictions which do not allow a psychologist or neuropsychologist to testify regarding the medical causation of a plaintiff's condition base their argument on the premise that psychologists are not medical doctors trained in the physiological aspects of the human body. *See, Edmonds v. Illinois Central Gulf R.R. Co.*, 910 F.2d 1284 (5th Cir.1990)(clinical psychologist not qualified to testify on alleged link between employee's job related stress and worsening of heart condition); *Freemon v. VF Corp., Kay Windsor Division*, 675 S.W.2d 710 (Tenn.1984)(trial court did not err in failing to base finding of permanent disability upon psychologist's testimony); *Haas v. Seekell*, 538 So.2d 1333 (Fla. 1st DCA 1989)(psychologist was not competent to testify regarding causal relationship between claimant's injury and organic personality syndrome); *Chandler Exterminators, Inc. v. Morris*, 262 Ga. 257, 416 S.E.2d 277 (1992)(neuropsychologist not competent to testify as to causation)(ruling subsequently superseded by statute as stated in *Drake v. LaRue Construction Co.*, 215 Ga. app. 453, 451 S.E.2d 792 (1994)); and *Martin v. Benson*, 125 N.C.App. 330, 481 S.E.2d 292 (1997) (neuropsychologist not competent to testify to medical causation as opinion invaded field reserved for the practice of medicine).

The majority of the states, however, have decided that a psychologist may give expert testimony regarding the causation of a brain injury. *See, Hutchison v. American Family Mutual Insurance Co.*, 514 N.W.2d 882, 886 (Iowa 1994)(and cases cited therein). In *Hutchison*, the Iowa Supreme Court noted that while the practice of medicine was statutorily excluded from the practice of psychology in its state, the court would follow a liberal interpretation of its expert witness statute and allow such testimony if the psychologist's knowledge, skill, experience, or education would assist the trier of fact to understand the issue of causation. *Id.* at 887–88.

In *Madrid v. University of California*, 105 N.M. 715, 717, 737 P.2d 74, 76 (1987), the New Mexico Supreme Court, in holding that a clinical psychologist was qualified to give an opinion concerning the causal connection between an employee's disability and employment, stated that:

It ... [is] a curious proposition that the legislature has enough confidence in the competence of non-physician health care providers to grant them licenses to practice their professions, and to authorize treatment by them to injured compensation claimants, but to have intended that those same health care providers be prohibited from testifying concerning the cause of an injury which lies squarely within the areas of their competency.

The *Madrid* court concluded that a medical license was not necessarily required to qualify an expert to give competent medical information regarding causation. *Id.* at 77.·

In *Cunningham v. Montgomery*, 143 Or. App. 171, 921 P.2d 1355 (1996), a patient brought a malpractice action against a dentist alleging that she suffered hypoxia that caused cognitive damage as a result of the dentist's use of nitrous oxide. On appeal, the patient argued that the trial court erred in excluding the testimony of her neuropsychologist on the issue of medical causation simply because the neuropsychologist was not a medical doctor. The Oregon Court of Appeals reversed the trial court holding that the neuropsychologist was qualified to testify as to the medical cause of the cognitive defects suffered by the patient. *Id.*, at 921 P.2d at 1359–60. The appellate court held that even though the neuropsychologist was not a medical doctor, the neuropsychologist's specialized training and experience with patients suffering from hypoxia qualified her to render an opinion on the causation of cognitive defects. *Id.* at 1360.

In *Seneca Falls Greenhouse & Nursery v. Layton*, 9 Va.App. 482, 389 S.E.2d 184 (1990),

an employee was exposed to insecticide while working in his employer's greenhouse. After seeking medical treatment, the employee was referred to a neuropsychologist. The neuropsychologist concluded that the employee was suffering from panic attacks related to his accident with the insecticide. *Id.*, 389 S.E.2d at 186. On appeal, the employer argued that there was insufficient evidence to support the worker's compensation board's finding that the employee's disability was the result of an industrial accident. The employer argued that the neuropsychologist was not a credible witness because she was not a medical doctor. The Virginia Court of Appeals held that the fact the neuropsychologist was not a medical doctor did not bar her from giving her expert opinion regarding the causal relationship between the insecticide exposure and the employee's injury. *Id.* at 187.

In *Howle v. PYA/Monarch, Inc.*, 288 S.C. 586, 344 S.E.2d 157 (App.1986), a psychologist testified that a plaintiff involved in an automobile accident suffered from acute anxiety neurosis with depression which was caused by the accident. On appeal, defendants contended that it was error for the trial court to admit the psychologist's testimony. The South Carolina Court of Appeals disagreed. Based on the psychologist's education, training, and experience, the court held that the psychologist was competent to testify as to the diagnosis, prognosis, and causation of mental and emotional disturbance. *Id.*, 344 S.E.2d at 161.[2]

Employer argues that many of the authorities we have cited which permit a psychologist to testify as to causation of a brain injury or other cognitive conditions should not be followed because the decisions rely in part on an interpretation of each state's rule of evidence patterned after Federal Rule of Evidence 702. Employer argues that since Missouri has not adopted Rule 702, the above cases are not controlling. Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Although Missouri has not adopted Rule 702, the Missouri legislature has enacted section 490.065. Section 490.065 provides in pertinent part:

In any civil action, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Section 490.065 is virtually identical to Rule 702.

Under section 490.065, expert testimony is properly admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." The essential test of expert opinion evidence is whether it will be helpful to the fact finder. *See, State ex rel. Lichtor v. Clark*, 845 S.W.2d 55, 59 (Mo.App.1992); *Stucker v. Chitwood*, 841 S.W.2d 816, 819 (Mo.App. 1992). Generally, the admission or exclusion of expert opinion testimony is a matter of trial court discretion. *Wingate v. Lester E. Cox Medical Ctr.*, 853 S.W.2d 912, 918 (Mo. banc 1993). The Commission, as fact finder, has discretion to determine an expert's qualifications to testify on specific matters. *Lane v. Schreiber Foods*, 903 S.W.2d 616, 621 (Mo. App.1995).

The use of the disjunctive "or" in section 490.065 recognizes that an expert witness may be qualified on foundations other than the expert's education or license. "There is no requirement that an expert witness have expertise based solely on his education. An individual with substantial practical and specialized practical experience

---

**2.** *See also, Valiulis v. Scheffels*, 191 Ill.App.3d 775, 138 Ill.Dec. 668, 675–676, 547 N.E.2d 1289, 1296–97 (1989), where the court stated that " ... it would be somewhat anomalous to conclude that [a neuropsychologist] would not be qualified to testify about [the cause of plaintiff's injury] when the neurologists and psychologist who sought out his expertise and assistance in diagnosing the disease would most likely be qualified to do so."

in a given area may also qualify as an expert." *Washburn v. Grundy Electric Cooperative*, 804 S.W.2d 424, 426 (Mo.App.1991). Missouri courts recognize that medical personnel, other than medical doctors, may be qualified to testify to matters *"within the limited and precise range of their medical specialties." Sigrist By and Through Sigrist v. Clarke*, 935 S.W.2d 350, 357 (Mo.App.1996)(citing *Cebula v. Benoit*, 652 S.W.2d 304, 308 (Mo.App.1983) (emphasis in original)). In fact, in *Childs v. Williams*, 825 S.W.2d 4, 10 (Mo.App.1992), this court stated that "[c]onceivably a psychologist or other non-physician might attain a degree of knowledge, skill, experience, training, or education in medicine that would provide the foundation to become a medical expert." [3]

The record supports the Commission's determination that Dr. Wetzel was qualified to testify as an expert as to the causation of claimant's injuries. Dr. Wetzel practices neuropsychology and is a full professor in neurology and in neurological surgery at Washington University School of Medicine. Dr. Wetzel has been published in medical journals and is a Fellow of the American Psychopathological Association. He teaches neurologists, neurosurgeons, and psychiatrists in the area of his expertise. Dr. Wetzel explained that clinical neuropsychology is the assessment, testing, and evaluation of people with disorders that may be psychiatric or related to a dysfunction in the brain. When it comes to assessing the cause and existence of brain damage, neurologists and neurosurgeons at Washington University School of Medicine come to Dr. Wetzel for both advice and training. Further, neurosurgeons rely on Dr. Wetzel to identify the area of the brain where surgery should be performed. One would be hard-pressed to conclude that Dr. Wetzel lacks the medical knowledge, skill, experience, or training simply because he is a psychologist and not a doctor of medicine.

Although the Commission could have found from employer's doctors' expert testimony that claimant's disabilities were not related to the incident involving the skyhook, the testimony of Dr. Wetzel was sufficient evidence from which the Commission could have found that claimant's disabilities were directly caused by the injury to claimant's head. It is within the province of the Commission to determine what weight it will accord expert testimony on medical causation. *McGrath*, 877 S.W.2d at 709. Where the right to compensation depends upon which two conflicting medical theories should be accepted, the issue is peculiarly for the Commission's determination. *Duncan*, 897 S.W.2d at 113. Employer's first point is denied.

In its second point, employer contends that the Commission erred in awarding claimant future medical treatment for his complaints of depression in that the complaints of depression were not related to a compensable injury, and there was no competent or substantial evidence to support the award. Employer's argument that there was no competent or substantial evidence to support the award of future medical treatment is two-fold. First, employer contends that the only evidence presented by claimant on the issue of future medical treatment was the testimony of Dr. Wetzel. According to employer, Dr. Wetzel's testimony was not competent evidence to support an award of future medical treatment, since the award consisted of anti-depressant medication. Since Dr. Wetzel, as a psychologist, could not prescribe medication, his testimony would be beyond his expertise and would be no more than conjecture and surmise. Second, employer argues that the Commission's award of future medical care was not based on competent and substantial evidence because Dr. Wetzel's testimony was premised upon medical records which were inadmissible. Employer argues that the records were inadmissible since they were not furnished to

---

**3.** *See generally, In Interest of C.L.M.*, 625 S.W.2d 613 (Mo.1981). Psychologist testified that patient's mental defects were "inorganic" or mental in nature rather than "organic" or physical in derivation. A psychiatrist, however, had determined that the patient's mental defects were organic in nature or caused by brain damage related to the patient's epilepsy. On appeal, the Missouri Supreme Court held that the opinion of a psychiatrist did not necessarily outweigh the psychologist's opinion.

the employer at least seven days before the date set for the hearing, and therefore, violated the seven day rule as provided in section 287.210.3. Thus, it is employer's contention that apart from Dr. Wetzel's testimony and the allegedly inadmissible records, there was no evidence in the record to support the award of future medical care. We disagree.

The worker's compensation act permits the allowance for the cost of future medical treatment in a permanent partial disability award. Section 287.140.1; *Polavarapu v. General Motors Corp.*, 897 S.W.2d 63, 66 (Mo.App.1995). The claimant is not required to present evidence on the specific medical treatment which will be necessary in the future in order to receive an award of future medical care. *Id.* However, where future medical benefits are awarded, the "medical care must flow from the accident before the employer is to be held responsible." *Modlin v. Sun Mark Inc.*, 699 S.W.2d 5, 7 (Mo.App.1985). It is not the claimant's burden to produce "conclusive testimony or evidence" to support his claim for future medical benefits. *Sifferman v. Sears, Roebuck, and Co.*, 906 S.W.2d 823, 828 (Mo.App. 1995). It is sufficient to award future medical benefits if the claimant shows by "reasonable probability" that he is in need of additional medical treatment by reason of his work-related accident. *Id.*

At the hearing, claimant testified that because of the accident he suffers from headaches and is prone to violent temper outbursts. Claimant further testified, without objection, that he had been seeing a Dr. Marta Mortensen, M.D. Claimant stated that Dr. Mortensen had recently prescribed him a drug called Buspar and sleeping pills to help him with his headaches. Claimant's wife also testified that claimant had been referred to Dr. Mortensen, who prescribed sleeping pills and Buspar to help him with his headaches and depression.

Dr. Wetzel stated that claimant had a combination of depression caused directly by the injury and that he also had a reactive depression, which was his reaction to the injury.

Dr. Wetzel stated that claimant's reactive depression was treatable and the odds were 85% that it would resolve over time. At the hearing, Dr. Wetzel stated that claimant had depression and that depression ordinarily responds to treatment. Further, Dr. Wetzel testified that claimant's ability to function would fluctuate depending upon whether he was receiving treatment or not. Dr. Fitzgerald also testified that claimant suffered from organic depression which was not treatable, as well as reactive depression, which was something that could respond to treatment.

Dr. Wetzel was asked by claimant's attorney whether he had an opinion as to whether or not claimant will continue to need treatment in the future for depression. Employer's attorney objected stating that since Dr. Wetzel was a psychologist and not a physician, it was beyond his expertise to answer the question. The ALJ overruled the objection. Dr. Wetzel stated that claimant was getting psychotropic antidepressant medication from his general practitioner and that claimant said he was doing better with the medication. Dr. Wetzel stated that there was no reason why claimant should not keep receiving the medication. Dr. Wetzel acknowledged on cross-examination that although he was not licensed to prescribe medication, psychologists often advise psychiatrists whether or not the medication they prescribe for depression is working or not.

Claimant offered the counseling records of St. Anthony's Hospital and the records of Dr. Mortensen in evidence. Employer objected because the records were not obtained until two days before the hearing. After the two days of testimony, there was a ten-day recess and the records were reoffered and admitted into evidence over employer's objection.

We find that even if portions of Dr. Wetzel's testimony about future medical treatment was premised on inadmissible medical records, the Commission's award was supported by sufficient evidence apart from that testimony.[4] *See generally, Sprung v. Interior Construction Service*, 752 S.W.2d 354, 358–359 (Mo.App.1988)(even if medical report was required to be given seven days before

---

4. We also note that even if the medical records were inadmissible under section 287.210.3, employer was not prejudiced by their admission. First, the Commission is not required to exclude medical records and testimony because of a violation of the seven-day rule. *Goodwin v. Farmers Elevator & Exchange*, 933 S.W.2d 926, 929 (Mo. App.1996). Second, there is no evidence in the

deposition there was substantial evidence to support Commission's finding); *see also, Polavarapu,* 897 S.W.2d at 66 (even if physician's testimony about claimant's future medical expenses was inadmissible, there was sufficient evidence apart from the physician's testimony to support the award).

Claimant testified that he continued to suffer from headaches and depression. He also stated that he was taking Buspar and sleeping pills to alleviate the headaches. Both Dr. Wetzel and Dr. Fitzgerald's testimony demonstrated that claimant suffered from reactive depression which was related to the 1989 injury. The evidence, apart from any reference to the allegedly inadmissible records, revealed that reactive depression, unlike organic depression, was treatable. *See, Talley v. Runny Meade Estates, Ltd.,* 831 S.W.2d 692, 694–95 (Mo.App.1992)(sufficient evidence supported award of the future medical benefits where claimant testified at the hearing she was still having headaches, was taking medication for them, and employee's physician stated that her headaches were related to the injury). Although Dr. Hogan and Dr. Stillings testified that claimant was in no need of additional treatment as a result of his accident, we defer to the Commission when it resolves conflicting evidence. *Hagan v. Paris & Osbourne Chevrolet,* 667 S.W.2d 1, 2 (Mo.App.1984). The award of future medical care was supported by competent and substantial evidence. Point two is denied.

■ In its third and final point, employer claims that the Commission's determination that claimant suffered 50% permanent partial disability as a result of the September 13, 1989 accident is not supported by the substantial and competent evidence. Employer maintains that the assessment of 50% permanent partial disability is not supported by the competent and substantial evidence because the evidence demonstrates that claimant missed less than five weeks of work as a result of the accident, and he has continued to work on an unrestricted basis to the satisfaction of his supervisors. Employer also argues that the assessment is not supported

by competent medical evidence. We disagree.

■ The Commission can consider all of the evidence in arriving at a percentage rating for the claimant's permanent partial disability. *Lytle v. T–Mac Inc.,* 931 S.W.2d 496, 501–502 (Mo.App.1996). The Commission is not bound by the percentage estimates of medical experts because the "degree of disability is not solely a medical question." *Bowman v. Zenith Radio Corp.,* 895 S.W.2d 276, 281 (Mo.App.1995). The determination of a specific amount or percentage of disability awarded to a claimant is a finding of fact within the unique province of the Commission. *Wiele v. National Super Mkts.,* 948 S.W.2d 142, 148 (Mo.App.1997); *Searcy v. McDonnell Douglas Aircraft Co.,* 894 S.W.2d 173, 179 (Mo.App.1995). The assessment will not be disturbed where the percentage of disability, as here, is hotly contested. *Parker v. Mueller Pipeline, Inc.,* 807 S.W.2d 518, 522 (Mo.App.1991).

Dr. Wetzel testified that claimant was 75% disabled in his body as a whole, and Dr. Fitzgerald testified that claimant sustained a 75–80% permanent partial disability as a result of the injury. Employer's witnesses, however, opined that claimant had not sustained a permanent partial disability or had a 5–8% permanent partial disability based on his subjective complaints. The ALJ and the Commission specifically found that claimant's expert witnesses were more credible. The Commission's determination regarding conflicting medical evidence is not to be disturbed unless it is against the weight of the overwhelming weight of the evidence. *Id.* The record indicates that the Commission had a sufficient basis upon which it could have found claimant suffered from a 50% permanent partial disability.

Employer also argues that the Commission ignored the testimony of other witnesses that claimant missed less than five weeks of work after the accident and had continued to work on an unrestricted basis, and therefore, the finding of 50% permanent partial disability was excessive. We disagree.

record that employer sought a continuance to review the medical records or to depose Dr. Mortensen. Finally, we believe that the spirit of the seven-day rule was met when the records were provided to the employer ten days before

they were admitted into evidence. Apart from this evidence, however, there was substantial evidence to support the award of future medical care.

An employee may sustain a permanent partial disability and still be able to work. *Wiele,* 948 S.W.2d at 148 (citing *Franklin v. St. Louis Independent Packing Company,* 360 S.W.2d 350, 355 (Mo.App.1962)). Further, an actual loss of earnings is not an essential element of a claim for permanent partial disability. *Wiele,* 948 S.W.2d at 148. A permanent partial disability can be awarded notwithstanding the fact the claimant returned to work if the claimant's injury impaired his efficiency in the ordinary pursuits of life. *Sapienza v. Deaconess Hospital,* 738 S.W.2d 149, 151 (Mo.App.1987) (citing *Komosa v. Monsanto Chemical Co.,* 317 S.W.2d 396, 400 (Mo.1958)).

There is ample evidence that the injury to claimant's head impaired his efficiency in the ordinary pursuits of life. Therefore, the award of 50% permanent partial disability was not excessive simply because claimant only missed five weeks of work. Point three is denied.

The judgment and award of the Commission is affirmed.

CRANE, P.J., and JAMES R. DOWD, J., concur.