Reimund GOERLICH, Respondent,

v.

TPF, INC. & Tony Prince Carpet Co., Appellants.

No. ED 80563.

Missouri Court of Appeals, Eastern District, Division Four.

Sept. 17, 2002.

George T. Floros, Mary Anne Lindsey, co-counsel, Evans & Dixon, L.L.C., St. Louis, MO, for appellants.

B. Michael Korte, Korte & Smallwood, St. Louis, MO, for respondent.

GLENN A. NORTON, Judge.

TPF, Inc. & Tony Price Carpet Co. appeal the Labor and Industrial Relations Commission's final award, which reversed the ALJ's decision and awarded compensation to Reimund Goerlich. The Commission found that an accident arising out of and in the course of employment caused injury to Goerlich's shoulder. The Commission awarded Goerlich past medical ex-

penses, temporary total disability and permanent partial disability.

## I. FACTS

Goerlich worked for TPF as a floor layer. In 1997, Goerlich was refurbishing a dormitory floor on the 9:00 p.m. to 5:30 a.m. shift. Between 4:00 and 4:30 a.m., Goerlich was applying a conditioner to the floor underneath a radiator. He was on his hands and knees, "sideways with" or "parallel" to the radiator. He used his left hand to support his body as he crouched down and, with a rag in his right hand, stretched his right arm out sideways from his right side to apply the conditioner under the radiator. Goerlich heard a popping sound and immediately felt pain and weakness in his right shoulder. He described the pain as sharp and throbbing and stated that it felt like his right arm was out of joint. On a scale of zero to ten, he rated the pain an eight. Goerlich had difficulty moving his right arm in certain positions and decided to leave work early. The symptoms worsened while he cleaned up his work area and put away his tools.

Goerlich said the pain reminded him of the pain he experienced when he dislocated his right shoulder in 1983. He felt that pain immediately too, but waited about two hours before he went to the emergency room. Goerlich testified that this was his only other shoulder injury, besides normal soreness from everyday working conditions as a floor layer.

Goerlich did not immediately seek medical attention for the injury in 1997 either, explaining that he did not know the severity of the injury at the time he left work. So he drove home and took some aspirin. The pain eased, and Goerlich thought it might be just more everyday soreness. He tried to sleep, but could not. Goerlich realized that the problem was getting worse and decided to have his father take him to the emergency room around 10:00 a.m.

Goerlich told emergency room personnel that his shoulder bothered him when he came home from work and that he had tried to sleep but was unable to do so due to the increasing pain. The history noted on the emergency room records states that he dislocated his shoulder while sleeping—that he awoke to a severe pain after turning over in his sleep. The records also indicated that Goerlich had dislocated his shoulder four times before. Goerlich testified that he did not recall telling anyone that he had dislocated his right shoulder while he was asleep, or that he had dislocated his shoulder four times. He admitted that he did not give the details of what happened at work, explaining that he did not know that it was necessary to tell them how the injury occurred. After three attempts, the shoulder was reset.

Goerlich completed an injury report, and TPF referred him to a doctor. The doctor gave Goerlich pain medicine and referred him to Dr. William Stetson, an orthopedist. Dr. Stetson recommended physical therapy and put Goerlich on light duty. Dr. Stetson performed arthroscopic stabilization surgery on the shoulder. The surgery helped, but Goerlich testified that he still experiences intermittent soreness. After a second course of physical therapy, Dr. Stetson released him to regular duty. Goerlich has been working full time ever since and has not lost any more time from work due to the shoulder.

In 1999, Dr. Shawn Berkin, a family practitioner, examined Goerlich at his attorney's request. He said that Goerlich told him that he reached under the radiator, his shoulder popped and dislocated and he went to the emergency room. Dr. Berkin did not know what position Goerlich was in when he reached under the radiator, but understood that his arm was

"in an extended or abducted fashion[,] which is a reasonable mechanism to cause that type of injury." Dr. Berkin diagnosed a dislocated shoulder with recurrent instability and a tear of the glenoid labrum in the right shoulder. Based on his examination of Goerlich and a review of his medical records, he concluded that the incident at work was the substantial factor causing this injury. He rated Goerlich's injury as a 40% permanent partial disability—10% due to pre-existing conditions, and 30% due to the 1997 work injury.

Dr. Berkin did not know before his deposition that Goerlich went home and tried to sleep before going to the emergency room or that his medical history indicated multiple dislocations in the past. After being asked to assume these facts, Dr. Berkin testified that "[i]t would appear that there are explanations other than what the patient told me that may have caused his problems," but that he still stood by his opinion that the work incident was a substantial factor in causing the shoulder injury. At most, Dr. Berkin speculated that perhaps the maneuver at work loosened the shoulder and then something Goerlich did in his sleep "carried it over," but it could not have dislocated from the sleeping alone. He agreed that it was "more than likely" that the shoulder would not have been in the same condition when Goerlich left work as it was at the time he arrived in the emergency room. And, even assuming that Goerlich had a chronic problem with dislocations and that something after the work incident may have happened, he felt comfortable assigning 30% of Goerlich's disability to the work injury.

In 2000, Dr. Michael Nogalski, an orthopedic physician, examined Goerlich at TPF's request. Goerlich described and demonstrated the movements he made at work while reaching under the radiator, which the doctor recounted as "an internal rotation and forward flexion maneuver with his arm and shoulder with possibly slight abduction." Forward flexion is "an arm held straight out in front of the body with the tip of the elbow up at about shoulder level and pointing straight forward." At first, Dr. Nogalski could not recall if Goerlich said he was facing the radiator or was along side of it, but he believed that "more of his body chest would be facing the face of that radiator surface that he had to go underneath rather than facing away to the side or perpendicular to the area."

He concluded that it was impossible that this type of maneuver could cause the type of dislocation Goerlich suffered. Dr. Nogalski also believed that the delay in seeking treatment "did not really make sense at all," because he would expect "most people" in that type of pain to go to the emergency room right away. Dr. Nogalski explained that he had seen patients who dislocated a shoulder in their sleep, but that is highly unlikely unless the shoulder is already grossly unstable. Nonetheless, he believed that here it was more likely that Goerlich's dislocation occurred in his sleep and not at work. Dr. Nogalski assigned a 10% permanent partial disability to Goerlich's shoulder injury—4% of which pre-existed the 1997 injury.

## II. PROCEDURAL HISTORY

Goerlich filed a claim for workers compensation, alleging a right shoulder and upper extremity injury. TPF denied that Goerlich sustained an accidental injury arising out of and in the course of his employment. At the hearing before the ALJ, Goerlich testified live, and the depositions of Dr. Berkin and Dr. Nogalski were admitted, along with the medical records of Dr. Stetson, the emergency room and other medical providers. Goerlich in-

troduced unpaid medical bills totaling $18,889.83. The ALJ found that Goerlich suffered an accident arising out of and in the course of his employment and that he had a 17% permanent partial disability attributable to the 1997 shoulder injury. But he did not award any compensation because Goerlich failed to establish that his work activities were a substantial factor causing the injury. The ALJ relied on the notes in the emergency room records and Dr. Nogalski's testimony in concluding that Goerlich dislocated his shoulder in his sleep at home.

Goerlich and TPF appealed to the Commission. The Commission agreed that Goerlich suffered an accident arising out of and in the course of employment, but also found that the accident caused the injury. The Commission relied on the testimony of Dr. Berkin and Goerlich. The Commission agreed with the ALJ's determination of 17% permanent partial disability and also awarded Goerlich temporary disability benefits and $18, 889.83 for past medical expenses. TPF appeals.

## III. DISCUSSION

### A. Standard of Review

On appeal from a decision in a workers compensation case, we "shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award."

Section 287.495.1 RSMo 2000.[1]

■■■ Where the Commission has reversed the ALJ, we conduct this review in two steps. In the first step, we examine "the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award. If not, the Commission's award must be reversed." *Davis v. Research Medical Center,* 903 S.W.2d 557, 571 (Mo.App. W.D.1995); *see also Buskuehl v. The Doe Run Co.,* 68 S.W.3d 535, 539–40 (Mo.App. E.D.2001). In this first step, we may disregard the credibility determinations of the ALJ. *Davis,* 903 S.W.2d at 570.

■■■ If there is competent and substantial evidence to support the award, then we move to the second step and determine whether the award is against the overwhelming weight of the evidence. *Davis,* 903 S.W.2d at 571. We again view the evidence in the light most favorable to the award, but we also consider all the evidence in the record, including evidence unfavorable to the award, and take into account the overall effect of all of the evidence. *Id.* "In doing so, [the court] takes into consideration the credibility determinations of the Commission and, if those determinations as to witnesses who gave live testimony before the ALJ are different than those made by the ALJ, it also considers the ALJ's credibility findings as well as the reasons, if any are given, why the Commission differed with those findings." *Id.* But we defer solely to the Commission as to the credibility of

1. All statutory references are to RSMo 2000.

witnesses who did not testify live. *See id.* at 573.

■ The workers compensation law should be construed liberally to further the goal of placing upon industry the losses sustained by employees from work-related injuries. *Brenneisen v. Leach's Standard Service Station,* 806 S.W.2d 443, 445 (Mo. App. E.D.1991). Thus, "any question as to the right of an employee to compensation must be resolved in favor of the injured employee." *Id.*

## B. Injury Caused by Work–Related Accident

■■ In Point I, TPF argues that the Commission erred as a matter of law in ruling that Goerlich sustained a work-related accident and that the shoulder dislocation was medically causally related to that accident. TPF contends that the evidence showed at least that there were two possible causes of the shoulder dislocation—the incident at work and the one at home—and thus Goerlich did not meet his burden of proof.

■ The workers compensation law provides that employers are liable to compensate employees for personal injury sustained "by accident arising out of and in the course of his employment . . ." Section 287.120.1. An accident is "an unexpected or unforeseen identifiable event or series of events happening suddenly and violently, with or without human fault, and producing at the time objective symptoms of an injury." Section 287.020.2. To arise out of and in the course of employment, the injury must be causally related to the employment. *Ludwinski v. National Courier,* 873 S.W.2d 890, 892 (Mo.App. E.D.1994). It must have occurred at a place where the employee would reasonably be and while he is reasonably fulfilling his employment duties. *Id.*

■ Goerlich's testimony alone, if believed, can constitute substantial evidence of the fact that an accident occurred. *Powers v. Universal Atlas Cement Co.,* 261 S.W.2d 512, 519 (Mo.App.1953); *see also Martin v. Mid–America Farm Lines, Inc.,* 769 S.W.2d 105, 107 (Mo. banc 1989). Here, Goerlich said that while performing his regular duties as a floor layer at his assigned work-site, his shoulder popped and he felt immediate pain. Goerlich was the only witness to these events, and TPF presented no evidence to contradict his account. Both the ALJ and the Commission believed Goerlich on this point and concluded that the accident arose out of and in the course of employment. There is no basis for overturning this conclusion. *See Davis,* 903 S.W.2d at 571 (where Commission affirms ALJ on issues involving live testimony, resulting consistency is powerful factor in favor of upholding award on appeal). The real issue is whether the accident caused the shoulder dislocation.

■ "An injury is only compensable if it is clearly work-related." *Cahall v. Cahall,* 963 S.W.2d 368, 372 (Mo.App. E.D. 1998). "An injury is clearly work related if it was a substantial factor in the cause of the resulting medical condition." Section 287.020.2. Thus, Goerlich much show a causal connection between the injury and the job. *See Williams v. DePaul Health Center,* 996 S.W.2d 619, 631 (Mo.App. E.D. 1999). "Medical causation, not within the common knowledge or experience, must be established by scientific or medical evidence showing the cause and effect relationship between the complained of condition and the asserted cause." *Id.* (quoting *McGrath v. Satellite Sprinkler Sys., Inc.,* 877 S.W.2d 704, 708 (Mo.App. E.D.1994)).

■ Dr. Berkin and Dr. Nogalski gave conflicting theories of causation. Each opinion has flaws: Dr. Nogalski's opinion

is based on an assumption that Goerlich was facing the radiator with his arm out in front of him, when Goerlich stated his body was parallel with the radiator and his arm was out from his side; Dr. Berkin's initial opinion was based on the assumption that Goerlich went straight to the emergency room. The problems with these opinions do not, however, go to the competency of the evidence, but to the weight to be given each opinion. The Commission determines what weight to accord expert testimony on medical causation. *Williams*, 996 S.W.2d at 631.

Here, the Commission found Dr. Berkin's testimony more persuasive and credible than Dr. Nogalski's. It believed Goerlich's testimony about his body position and arm movement. Therefore, it determined that Dr. Nogalski's opinion—that Goerlich's shoulder could not have dislocated by moving his arm forward while facing the radiator—was fatally flawed because he misunderstood Goerlich's movement and position. On the other hand, the Commission determined that Dr. Berkin's misunderstanding of the timing of treatment was not fatal because he ultimately concluded that the injury occurred at work. Where the right to compensation depends on which of two conflicting medical opinions should be accepted, "the issue is peculiarly for the Commission's determination." *Landers v. Chrysler Corp.*, 963 S.W.2d 275, 282 (Mo.App. E.D.1998). This is especially true in cases like this, where the two doctors providing testimony as to causation appeared by deposition; in these cases there is no need to consider the ALJ's determinations of credibility and weight. *See Davis*, 903 S.W.2d at 573; *see also Williams*, 996 S.W.2d at 631. Even if we did, the Commission has adequately explained its reasons for reaching different conclusions about these expert opinions, and we agree with the reasons. Dr. Berkin's testimony is sufficient competent evidence to support the finding that the work accident was a substantial factor in causing the injury.

The Commission's conclusion is not against the overwhelming weight of the contrary evidence. As we have already noted, we agree with and will defer to the Commission's discrediting of Dr. Nogalski's opinion as to causation; it is not overwhelming evidence. Likewise, the notation on emergency room records that Goerlich dislocated his shoulder in his sleep is not overwhelming evidence. We agree with the Commission that TPF did not demonstrate the reliability or accuracy of these records. We also agree with the Commission that these notations are not intended to represent a complete history of the events leading to an emergency room visit or to describe the mechanism of the injury. Thus, the records do not create an inconsistency with Goerlich's credible explanation of what happened. The Commission also explained that any inconsistencies between Goerlich's testimony regarding prior dislocations and the history of dislocations in the medical records did not affect Goerlich's overall credibility because they could be explained by simple misunderstandings, miscommunication or poor memories.

Point I is denied.

## C. Past Medical Expenses

In Point II, TPF argues that the Commission erred in awarding Goerlich past medical expenses because there was insufficient evidence demonstrating that the medical charges were fair and reasonable. It asks that we set aside the $18,889.83 award.

In addition to other compensation, employers are required to "provide such medical, surgical, chiropractic, and hospital treatment, including nursing, custodial,

ambulance and medicines, as may reasonably be required after the injury or disability, to cure and relieve from the effects of the injury." Section 287.140.1. All charges for medical services must be fair and reasonable. Section 287.140.3.

■ First, TPF stipulated that one medical bill for $5,045 was reasonable and necessary in connection with the treatment of Goerlich's injury and agreed to pay it if the injury was found to be compensable. Therefore, TPF cannot contest the reasonableness of that charge now. *See generally Hagedorn v. Adams*, 854 S.W.2d 470, 477 (Mo.App. W.D.1993) (in personal injury case, counsel's argument on appeal that medical expenses were unreasonable and unnecessary was waived by stipulation at trial that expenses were reasonable and necessary).

■ As to the remaining amount, Goerlich presented unpaid bills and related medical records. He also testified that his visits to the doctors and various hospitals were for treatment of his shoulder injury. "[W]hen such testimony accompanies the bills, which the employee identifies as being related to and the product of [his] injury, and when the bills relate to the professional services rendered as shown by the medical records in evidence, a sufficient factual basis exists for the [C]ommission to award compensation." *Martin*, 769 S.W.2d at 111–12.

The employer, of course, may show that the bills are not reasonable or fair or that the medical expenses incurred were not related to the injury in question. *Id.* at 112. But here, as in *Martin*, TPF did not make any such showing. *See id.* The only challenge it made was to the competency of Dr. Berkin's testimony that the bills were reasonable and necessary. TPF cross-examined Dr. Berkin on his expertise to render an opinion as to the reasonableness of charges for treatments he did

not perform in his family practice—like shoulder surgery. That Dr. Berkin did not have "day-to-day" experience with bills for the particular type of treatment Goerlich received possibly could affect the weight given to his opinion. But, again, determinations of weight are for the Commission and will not be reviewed by this Court. *See Cahall*, 963 S.W.2d at 371–72. Therefore, we will not disturb the Commission's decision that Dr. Berkin's testimony was competent and persuasive, especially where TPF put on no evidence that the bills were unfair, unreasonable or unnecessary.

There was competent and substantial evidence that Goerlich incurred $18,889.83 in medical expenses and that the charges were fair, reasonable and necessary to treat his work-related injury. Having failed to present any contrary evidence, TPF has provided no basis for overturning the Commission's award.

Point II is denied.

### D. Permanent Partial and Temporary Total Disability

■ In Point III, TPF argues that the determination of 17% permanent partial disability is erroneous for two reasons: 1) Goerlich failed to present evidence to exclude a finding that a non-compensable event caused all or part of his disability and 2) the award was excessive and contrary to the weight of the evidence.

■ It is true that when multiple events, some compensable and some not compensable, contribute to an alleged disability, the employee must prove the nature and extent of the disability attributable to the job-related event. *See Bersett v. National Super Markets, Inc.*, 808 S.W.2d 34, 35 (Mo.App. E.D.1991). Here, there may have been some evidence presented that both work and sleeping con-

tributed to Goerlich's injury, but the Commission concluded that the injury was caused only by the work-related accident. We have already said that we agree with this conclusion. Thus, the failure of the Commission to attribute any portion of the disability to an event that it did not find to have caused any portion of the disability is not error. *See Strate v. Al Baker's Restaurant,* 864 S.W.2d 417, 420 (Mo.App. E.D.1993) (distinguishing *Bersett* and affirming low apportionment of disability to non-compensable event where there was evidence that the non-compensable event did not cause the disability).

 We also disagree that there is overwhelming evidence demonstrating that the 17% permanent partial disability is excessive. TPF points out that Goerlich still works, has not lost time at work since the accident, takes no medication and has sought no treatment since 1997. But these facts are not inconsistent with a finding that he has a permanent partial disability. "A permanent partial disability can be awarded notwithstanding the fact that the claimant returned to work if the claimant's injury impaired his efficiency in the ordinary pursuits of life." *Landers,* 963 S.W.2d at 284–85. Goerlich has occasional soreness in his shoulder and is more guarded with his shoulder now than before the injury. In fact, both experts concluded that there was some degree of permanent disability in the shoulder.

The percentage of the disability is within the unique province of the Commission to decide. *Id.* "The assessment will not be disturbed where the percentage of disability, as here, is hotly contested." *Id.* Given that the 17% determination falls almost in the middle of the broad range presented by the medical experts—Dr. Nogalski said 6%, and Dr. Berkin said 30%—we cannot conclude that the Commission erred. *See Brookman v. Henry*

*Transp.,* 924 S.W.2d 286, 291 (Mo.App. E.D.1996).

TPF also contends that the Commission erred by awarding temporary total disability benefits because Goerlich failed to prove that his injury resulted from a work-related accident. We have already affirmed the conclusion that the injury was caused by the work-related accident, and TPF provides no other basis for reversing this award.

Point III is denied.

## IV. CONCLUSION

The judgment is affirmed.

WILLIAM H. CRANDALL, P.J. and SHERRI B. SULLIVAN, J. concurring.