Immar MEDRANO, Respondent,

v.

**MARSHALL ELECTRICAL CONTRACTING INC.,**
Appellant.

No. WD 64503.

Missouri Court of Appeals,
Western District.

July 26, 2005.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 30, 2005.

Application for Transfer Denied
Nov. 1, 2005.

Thomas G. Munsell, Kansas City, MO, for appellant.

Jerrold Kenter, Sedalia, MO, Donald G. Stouffer, Marshall, MO, for respondent.

Before: BRECKENRIDGE, P.J., LOWENSTEIN and HARDWICK, JJ.

LISA WHITE HARDWICK, Judge.

Marshall Electrical Contracting, Inc. (MEC) appeals from the Labor & Industrial Relations Commission's award of death benefits to the dependents of Immar Medrano. MEC seeks reversal of the award based on two points of error: (1) the Commission erred in determining that Medrano's accidental death arose out of and in the course of his employment with MEC; and (2) due process was denied because the administrative review was conducted by only two of the three Commission members.

### Factual and Procedural History

Immar Medrano was fatally injured on February 28, 2001, when his car collided head-on with a drunk driver who crossed the centerline of U.S. Highway 65. Medrano was employed by MEC as a journeyman electrician in Marshall. At the time the accident occurred, he was driving home from an electrician apprenticeship night class in Sedalia, for which MEC had paid his tuition and book fees.

Medrano's wife and two children filed a workers' compensation claim for death benefits against MEC. After a hearing, the administrative law judge (ALJ) denied the claim based on a determination that Medrano's death did not arise out of nor within the course and scope of his employment.

Medrano's dependents sought review from the Labor & Industrial Relations Commission. One of the Commission members, John B. Boyd, recused himself because he was the attorney for the dependents at the ALJ hearing.[1] The administrative review was conducted by the two remaining Commission members, who reversed the ALJ's decision and awarded death benefits to Medrano's dependents. The Commission determined the claim was compensable because Medrano's attendance at the apprenticeship class mutually benefited him and his employer. MEC appeals from the Commission's final award of death benefits.

### Standard of Review

On appeal, we must affirm the Commission's final award unless it acted without or beyond its power, the award was procured by fraud, the facts found do not support the award, or the award is not supported by sufficient competent evidence in the record. § 287.495.1, RSMo 2000.[2] We determine whether the award is supported by competent and substantial evidence by examining the facts in the context of the entire record. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223 (Mo. banc 2003). We must ascertain "whether the Commission could have reasonably made its findings and reached its result upon consideration of all of the evidence before it." *Henley v. Tan Co.*, 140 S.W.3d 195, 198 (Mo.App.2004).

In making this determination, it is not our duty to reweigh the evidence. *Id.* Findings of fact made by the Commission within its powers are conclusive and binding. § 287.495.1. While this generally requires that we defer to the Commission's credibility determinations, if those deter-

---

1. Boyd was appointed to the Commission on or about August 1, 2004, several months after the ALJ hearing on Medrano's claim for death benefits.

2. All statutory citations are to the Missouri Revised Statutes 2000, unless otherwise indicated.

minations as to witnesses who gave live testimony before the ALJ differ from those made by the ALJ, we must also consider the ALJ's credibility findings along with reasons the Commission differed from those findings. See *Goerlich v. TPF, Inc.*, 85 S.W.3d 724, 729 (Mo.App. 2002) (overruled on other grounds by *Hampton*, 121 S.W.3d 220). With regard to questions of law, our review is independent and without deference to the Commission's findings. *Henley*, 140 S.W.3d at 198.

## Points on Appeal

### *Mutual Benefit Doctrine*

 In its first point, MEC contends the Commission erred in awarding benefits because Medrano's accidental death did not arise out of and in the course of his employment, as required by Section 287.120.1[3] of the Workers' Compensation Law. At the time of the accident, Medrano was returning to his home in Marshall after attending an electrician apprentice night class in Sedalia. MEC argues that the class was not required as a condition of Medrano's employment and, thus, the seventy-mile round-trip travel to and from the instructional program was solely for his personal benefit. MEC contends the Commission erred in concluding the death claim was compensable based on the mutual benefit doctrine.

 Workers' compensation benefits are available for the "personal injury or death of the employee by accident arising out of and in the course of his employment." § 287.120.1. An injury arises out of the employment if it is a natural and reasonable incident thereof. *McClain v. Welsh Co.*, 748 S.W.2d 720, 724 (Mo.App.

1988). An injury is within the course of employment if it occurs during the period of employment at a place where the employee may reasonably be fulfilling the duties of his job. *Id.* These are two separate tests, both of which must be met before an employee is entitled to compensation. *Rogers v. Pacesetter Corp.*, 972 S.W.2d 540, 543 (Mo.App.1998).

 In determining that Medrano's accidental death arose out of and in the course of his employment with MEC, the Commission relied on the mutual benefit doctrine. The doctrine holds that "an injury suffered by an employee while performing an act for the mutual benefit of the employer and the employee is usually compensable." *Blades v. Commercial Transp., Inc.*, 30 S.W.3d 827, 829 (Mo. banc 2000) (citations omitted). "Each case turns on its own facts under the mutual benefits doctrine. The test is not whether any conceivable benefit to the employer can be articulated no matter how strained, but whether the act that resulted in the injury is of some substantive benefit to the employer." *Id.* at 831.

In *Blades*, the Supreme Court considered whether the mutual benefit doctrine could be applied to a truck driver who sought workers' compensation for injuries that occurred when he slipped on icy steps while walking into a union hall to testify at an arbitration hearing. *Id.* at 828. The Court identified several factors relevant to its analysis. A claim might be compensable if an "employer knew or had reason to know of the employee's presence at the place of injury and had by words or conduct encouraged the claimant to perform an act from which the employer would gain some benefit." *Id.* at 830–31. The Court

---

**3.** All statutory citations are to the Missouri Revised Statutes 2000, unless otherwise indicated.

considered whether the injury occurred while the employee was exposed to special hazards associated with employment but away from the employer's premises. *Id.* at 831. The ability of the employer to supervise and control the conditions and circumstances at the time of injury was also a relevant factor. *Id.* at 829.

The Court noted, in *Blades,* that the truck driver's injury occurred when he was on his way to give hearing testimony *adverse* to the employer's interests. The employer did not require or encourage the truck driver to attend the hearing. Walking into a union hall generally did not pose any special hazards and, even so, the employer had no control over the area where the accident occurred. Although the hearing involved compensation issues that might indirectly affect the truck driver's employment, the Court held that any alleged benefit to the employer was "too attenuated and remote to invoke the mutual benefit doctrine." *Id.*

As in *Blades,* MEC argues that it received no benefit from Medrano's attendance at the apprenticeship class and, thus, the Commission erred in determining the death claim was compensable. However, our review of the entire record indicates there is substantial and competent evidence to support the Commission's finding that the classroom instruction was mutually beneficial to Medrano and his employer.

Mike Mills, the owner and president of MEC, testified at the administrative hearing. Mills explained that the electrician apprenticeship program was coordinated by the Central Missouri Independent Electrical Contractors (CMIEC), a local chapter of the National Independent Electrical Contractors Association. MEC was a member contractor of the CMIEC, and Mills served as Chairman of the Apprenticeship Committee for the organization. The apprenticeship program consisted of 8,000 hours of on-the-job training and 576 classroom instruction hours. After completion of the four-year program, an apprentice would be classified as a "journeyman electrician."

MEC began using the apprenticeship program in the fall of 2000 as an "easier" way to develop a skilled work force, after Mills "got tired" of conducting all training for his employees. MEC paid a flat tuition fee of $.25 per billable employee hour to fund the apprenticeship program. MEC also paid for the course books for its employees, though it was not obligated to do so by the CMIEC. All MEC employees were offered the opportunity to attend the classroom instruction at no additional charge, regardless of whether they were working as apprentices or journeymen.

The classroom instruction was held in the evenings in Sedalia at the State Fair Community College. Employees were permitted to leave their cars in MEC's parking lot in Marshall and then carpool thirty-five miles each way to and from Sedalia. MEC gave employees time off work, when needed, to complete classroom assignments. The employees were not paid, however, for time spent attending or traveling to and from the classes.

Mills recalled offering the classroom instruction to Medrano as a way to further his education. Although Medrano had enough work experience to hold the title of lead electrician or journeyman at MEC, he had no formal training and needed to complete the apprenticeship program to qualify for IEC classification as a journeyman. Mills viewed the coursework as a way to "round out" Medrano's skills. Medrano attended the class from the fall of 2000 until his death on February 28, 2001.

Mills testified that the quality of work, knowledge, skills, and speed of his employees were enhanced by the apprenticeship

program. The training made the employees more valuable to MEC by improving the quality of service to customers. Mills acknowledged MEC was better able to compete with area businesses because of the skills its employees developed through the on-the job training and class instruction.

The record is sufficient to show that MEC derived a substantial benefit from having its employees travel from Marshall to Sedalia to fully participate in the apprenticeship program. MEC encouraged employees to attend the classroom instruction, covered the costs of tuition and books, and facilitated parking to make their travel more efficient and safe. The parking arrangements suggest MEC was aware of the special hazards facing the employees who drove long distances away from the employer's premises to obtain instruction. MEC also exercised some degree of control over the instructional aspects of the apprenticeship program as a member contractor of CMIEC and with Mills serving as Chairman of the Apprenticeship Committee. Even though employees like Medrano obtained personal benefits in formalizing their education, MEC mutually benefited from the program as convenient way for MEC to train its employees and ultimately provide a better quality of service to its customers.

MEC argues that *McQuerrey v. Smith St. John Manufacturing. Co.*, 240 Mo.App. 720, 216 S.W.2d 534 (1948), is controlling authority and precludes a finding of mutual benefit from the apprenticeship program. In *McQuerrey*, the employer signed an Apprenticeship Agreement to provide employment and training opportunities to a carpenter employee. *Id.* at 535.

The employee was later injured while participating in an evening vocational class at a high school. *Id.* at 535–36. The court determined the injury did not arise out of and in the course of employment because "the employer did not have the right to control the means and manner of the service or work" at the vocational class. *Id.* at 537. Significant to the court's decision were the following facts: the employer did not provide tuition or class materials; the Apprenticeship Agreement clearly stated that class attendance was not work and the employee would not be paid for such attendance; the employer assumed contractual responsibility only for training the employee in the shop during working hours and had no obligation to make arrangements for class instruction; and the employer had no involvement in approving the class or in supervising or controlling the instructional circumstances. *Id.* at 536–37. The court concluded that the "outside instruction was for the benefit of the apprentice and not for any particular employer." *Id.* at 537.

*McQuerrey* is distinguished from this case. MEC offered the classroom instruction to its employees, paid all associated costs, and encouraged employees to attend by giving them time off work to complete assignments and providing parking for carpoolers. MEC exercised far greater control over and involvement in the classroom part of the apprenticeship program than the employer in *McQuerrey*.

As the Commission noted, MEC not only encouraged employees to improve their skills by attending the class, it terminated at least one employee who failed the coursework.[4] Mills acknowledged that

4. The Commission's finding on this issue differed from the ALJ's based on conflicting interpretations of Mills' testimony. On direct examination from the claimant's attorney,

Mills twice confirmed that an MEC employee, Peter Freezee, was "fired when he failed the coursework of the apprentice program." Later, upon examination by MEC's attorney,

other MEC employees also could be subject to discharge for failing the curriculum. This testimony further distinguishes this case from *McQuerrey* and supports the Commission's finding that MEC benefited from the apprenticeship program by improving the quality of its workforce.

The record is sufficient to show that Medrano's accidental death arose out of and in the course of his employment. Medrano attended the instructional class, with the sponsorship and encouragement of MEC, as a way to round out skills that would benefit both him and his employer. His class attendance was a natural and reasonable incident of his employment. The accident occurred within the course of Medrano's employment because he was required to travel a significant distance to attend the class selected by his employer and fulfill the instructional requirements of the apprenticeship training.

Although an employee generally is not entitled to compensation for injuries sustained while going to or from the place of employment, the law recognizes an exception when the employee is attending or traveling to or from an employer-sponsored event if the activity benefits the employer's business in some way. *Ludwinski v. Nat'l Courier*, 873 S.W.2d 890, 892 (Mo.App.1994); *Rogers v. Pacesetter Corp.*, 972 S.W.2d 540, 543 (Mo.App.1998). Where travel is involved, this mutual benefit exception is known as the "dual purpose doctrine" because the work of the employee creates a necessity for travel even though the employee may be serving some purpose of his own. *Rogers*, 972 S.W.2d at 543. The dual purpose doctrine recognizes "that if the exposure to the perils of the highway is related to the employment even though the employment is not the sole cause of such exposure to such risks but is combined with or is a concurrent personal cause, the benefit of compensation is not to be withdrawn." *Id.* (citation omitted).

We find no error in the Commission's determination that Medrano suffered a compensable injury while traveling home from the employer-sponsored apprenticeship night class. The record supports a finding that MEC benefited from Medrano's attendance at the class and, therefore, the Commission properly applied the law in concluding that Medrano's death arose out of and in the course of his employment. Point denied.

### Due Process

■■■ In its second point, MEC contends due process was denied because the administrative review was conducted by only two of the three Commission members. Commission member, John B. Boyd, recused himself from the review because he had served as attorney for the Medrano family at the ALJ hearing (prior to his Commission appointment). Because Mr. Boyd was the only Commission member who was licensed to practice law, MEC argues an acting commissioner should have been appointed to replace him, and the review should not have proceeded with the two non-lawyer members. MEC argues it was denied "the opportunity to be heard at a meaningful time and in a meaningful manner," as contemplated by the due process requirements of the Missouri Constitution, Art. I, § 10, because the review was conducted by two commissioners who had

---

Mills said he could no longer afford to pay Freezee at the wage rate he was making unless Freezee completed the coursework. Based on the latter testimony, the ALJ determined the "real reason" for Freezee's termination was poor job performance and not his coursework failure. Upon review of the entire record, we believe Mills' testimony is more accurately represented by the Commission's finding that MEC "punished failure" by terminating an employee who did not successfully complete the class.

no legal training. *Willard v. Red Lobster,* 926 S.W.2d 550, 553 (Mo.App.1996).

■ Pursuant to the Missouri Constitution and statutory authority, the Labor and Industrial Relations Commission is made up of three appointed members, each serving in a representative capacity: an attorney/public representative, an employer representative, and an employee representative. Mo. CONST., Art. IV, § 49; § 286.010. "*Any* two commissioners shall constitute a quorum" for purposes of an administrative review and any other business of the Commission. § 286.010 (emphasis added). Despite previous challenges to the constitutionality of the quorum provision, our court has determined the Commission can lawfully operate with only two members. *Terrell v. Bd. of Educ. of St. Louis,* 871 S.W.2d 20, 22 (Mo.App.1993). A workers' compensation award issued by a quorum of the Commission is valid and enforceable. *Id.*

■ There is no requirement that one member of the quorum must be a licensed attorney. MEC fails to provide any support for its argument in this regard. The Commission could properly proceed without a replacement for Mr. Boyd because an award rendered by "any two commissioners" is lawful. § 286.010. We find no due process violation in the award of death benefits to Medrano's dependents.

All concur.