**Ricky D. WILSON, Jr., Appellant,**

v.

**Ricky WILSON, Jr., Respondent.**

**No. WD 73742.**

Missouri Court of Appeals, Western District.

Dec. 20, 2011.

Application for Transfer to Supreme Court Denied Jan. 31, 2012.

Application for Transfer Denied April 3, 2012.

**838**

Mark Kolich, Lenexa, KS, Frank Eppright, Elaine Eppright, Kansas City, MO, for Appellant.

Jeff Stigall, Don Peterson, Kansas City, MO, for Respondent.

Before ALOK AHUJA, P.J., THOMAS H. NEWTON, and JAMES EDWARD WELSH, JJ.

JAMES EDWARD WELSH, Judge.

Ricky D. Wilson, Jr., appeals the Labor and Industrial Relations Commission's decision that he is not entitled to workers' compensation benefits.[1] The Commission determined that Wilson did not meet his burden of establishing that his injury arose out of and in the course of his employment. Wilson contends that the Commission incorrectly applied the dual purpose doctrine and mutual benefit doctrine because the evidence established that he was injured during a trip motivated by business. Wilson also contends that the Commission's finding that Wilson had deviated from his employment was contrary to the overwhelming weight of the evidence because the evidence established that Wilson's business objective had not been abandoned and that he had not engaged in any personal activity unrelated to his job at the time of his injury. Finally, Wilson asserts that the Commission erred in finding that he had deviated from his employment because the Commission failed to consider that Wilson was acting for the mutual benefit of his business as he was in need of and was going to get gasoline for his vehicle to complete his business trip at the time of the accident. We disagree and affirm the Commission's decision.

---

1. Wilson's employer filed a motion, which was taken with the case, to dismiss this case based upon Wilson's alleged failure to comply with the briefing requirements of Rule 84.04. "While not condoning noncompliance with the rules, a court will generally, as a matter of discretion, review on the merits where disposition is not hampered by the rule violations." *Lewis v. Biegel*, 204 S.W.3d 354, 364 n. 10 (Mo.App.2006) (internal quotes and citation omitted). The deficiencies complained of by Wilson's employer do not impede the disposition of this appeal. We, therefore, deny the motion to dismiss.

Wilson is the owner and the employee of a company which moved mobile homes from sales sites to the buyers' places of installation. On December 13, 2008, Wilson was injured in a single vehicle accident, while he was on the way to a business associate's property to hunt for deer.

Due to his injuries from the accident, Wilson has serious memory problems and is unable to recall what happened on December 13, 2008, or in the days immediately preceding the accident. Thus, the facts concerning Wilson's intentions and the purposes for his trip on that day were gleaned from four witnesses: (1) Nancy Morris, who was Wilson's live-in girlfriend and the mother of their daughter; (2) Robert Francis, a business associate of Wilson's and the lessee of the property where Wilson planned to hunt for deer that day, (3) Frederick White, Jr., the manager of Iseman Mobile Homes, whom Wilson said that he was going to meet that day to discuss a business opportunity, and (4) Jeffrey Dalton, the owner of Hamilton Homes Center, with whom Wilson had discussed his plans to go hunting for deer on Francis's property.

According to Wilson's girlfriend, Nancy Morris, on the Thursday evening before the accident in this case, Wilson told her that that he had a meeting with someone at Iseman Mobile Homes on the upcoming Saturday and that he planned on going hunting sometime on Saturday. On Friday evening, Morris said that Wilson told her son that he could not go hunting with him "because he also had business to tend to." On Saturday morning, before Wilson left the house, Morris said that Wilson told her that he was going to talk to Francis "to see if he would be an escort driver"[2] when he moved the mobile homes.[3] Wilson again told Morris that "he was going to go up and talk to Iseman about moving their homes and setting them up, and he was also going to hunt." Morris said, however, that she did not know if Wilson was going to go hunting first before he talked to Francis or before meeting with Iseman Mobile Homes. She does remember, however, that Wilson left their house in Independence, Missouri, at 4:45 a.m.

Robert Francis met Wilson in 2007 when Francis was working with Hamilton Homes Center and Wilson was hired by Hamilton Homes Center to install the mobile homes that Hamilton Homes Center sold. In addition to cleaning mobile homes, Francis worked as an escort driver for Hamilton Homes Center. After Wilson purchased the truck used to deliver the mobile homes from Hamilton Homes Center, Francis began working as an escort driver for Wilson. Francis said that he worked as an independent contractor, that he was never an employee of Wilson's company, and that Wilson paid him in cash. According to Francis, he stopped working for Wilson in October 2008 because "there really wasn't any more work."

Francis lived on 20 acres of property and leased an additional 200 acres of property near Bogard, Missouri, which was approximately 19 miles south of Chillicothe. Francis said that he had invited Wilson to his property to hunt for deer. In November 2008, Wilson took Francis up on his offer, and he went to Francis's property and hunted for deer. This was the first time that Wilson had been to Francis's property. When Wilson arrived

2. An escort is the driver of a vehicle that drives ahead of the truck transporting the mobile home.

3. Morris said that she did not know why Wilson would ask Francis to be an escort driver when Francis had already been working for Wilson on numerous occasions before as an escort driver.

at Francis's house, it was dark, so Francis got in his truck and had Wilson follow him so that he could show him where to hunt. Francis left Wilson to hunt on his own. Francis returned home, and then he and his wife went back to check on Wilson around lunch time and invited Wilson back to their house for lunch. Over lunch, Francis and Wilson discussed various aspects of the mobile home delivery business and potential jobs.[4] After lunch, Wilson went back to hunt, and Francis did not see Wilson again that day.

According to Francis, on the Thursday before Wilson's Saturday accident, Wilson telephoned Francis and asked if he could go hunting on his property again. Francis said that Wilson told him that he wanted to hunt and then go meet with the manager of Iseman Mobile Homes in Chillicothe, Missouri, at noon on Saturday, December 13. On the day before his accident, Wilson again telephoned Francis. Wilson told Francis that he was planning on hunting on Francis's property the following morning and that he was then meeting with someone at Iseman Mobile Homes in Chillicothe at around noon. During both their Thursday and Friday evening telephone conversations, Francis said that Wilson never once indicated that he desired to discuss any business matter with him either before or after his hunting trip.

In the pre-dawn hours on Saturday morning before the accident, Wilson telephoned Francis and woke him up at 5:05 a.m. to tell him that he was lost. Francis gave Wilson directions to his property and then went back to bed. At 5:20 a.m., Wilson telephoned again for directions, and Francis again gave him directions. Wilson called again at 5:33 a.m. for directions, and Francis gave him further directions. Seven minutes later at 5:40 a.m.,

Wilson again telephoned Francis to tell him that he had made a wrong turn and to express concern that he was running out of gas. Francis told Wilson that he had turned east rather than west off of the Highway Z blacktop onto County Road 130 and had driven east over to the Highway 65 blacktop which was the opposite direction from his property. Francis then told Wilson to turn around, go back and cross the Highway Z blacktop, and continue west on the gravel County Road 130 to Francis's property. Francis told Wilson that he would drive out and look for him just in case he ran out of gas. Francis then heard a noise on Wilson's end of the phone. The loud noise was the last thing that Francis heard from Wilson's end of the phone. Francis then went looking for Wilson.

There was no business discussed during any of these four Saturday morning telephone conversations between Francis and Wilson. The only business connection with the hunting trip that was communicated to Francis by Wilson was that he was going to meet with someone at Iseman Mobile Homes in Chillicothe at noon after he had hunted for deer on Francis's property.

After their fourth telephone conversation that Saturday morning, Wilson was heading west on County Road 130 back to Highway Z when his truck drove through a railing and off a bridge into a creek bed below. At first, Francis did not find Wilson when he went looking for him, so Francis returned home. Francis then recalled that part of the railing had been missing on the bridge located on County Road 130 just east of Highway Z. Francis went back out and found Wilson's truck overturned in the creek below. When

---

4. Francis testified that he was not aware of any actual work that materialized out of the potential jobs that he and Wilson had discussed in their November lunch conversation.

found, Wilson was dressed in full camouflage and had his deer rifle in his truck.

Wilson had also talked with Frederick White, Jr., a consultant for Iseman Mobile Homes, by telephone prior to Wilson's accident. White was responsible for arranging the transportation and the set up of mobile homes sold by Iseman Mobile Homes. Iseman Mobile Homes is a mobile home dealer that is located in Chillicothe, Missouri. According to White, he had talked with Wilson several times on the telephone and set up several appointments to meet with Wilson to discuss with him the possibility of using him to transport and set up mobile homes for Iseman Mobile Homes. Wilson, however, had been unable to keep any of those appointments. On the Tuesday or Wednesday before the accident, White talked with Wilson by telephone and told him that he had an open invitation to meet with him either before 8:00 a.m. on Friday or before 9:00 a.m. on that Saturday. White mentioned to Wilson in their telephone conversation that Iseman Mobile Homes had several potential jobs, which White generally described as one in Hamilton, one in Chillicothe, one south of Chillicothe down by the Pin Oak sporting range,[5] one down by Hardin, one down by Milan, and one down by Carrollton. White told Wilson that he would have to first meet with him before he hired Wilson to transport and set mobile homes for Iseman Mobile Homes. Due to his accident, Wilson never met with White on that Saturday.

On the Friday before his hunting trip, Wilson also had talked by telephone with Jeffrey Scott Dalton, the president of Hamilton Home Center, about going to Francis's property the next morning to go hunting. Dalton offered to let Wilson hunt on his place to save him 60–70 miles of driving to which Wilson had responded that there were deer stands already set up on Francis's property. There was no conversation between Mr. Dalton and Wilson concerning the scheduling of any business.

Wilson was severely injured when he drove his truck off the bridge. After his accident, Wilson filed a claim for workers' compensation alleging that he was injured in the course and scope of his employment. The administrative law judge of the Division of Workers' Compensation found that Wilson sustained an injury arising out of and in the course of his employment on December 13, 2008. The ALJ ruled that Wilson was entitled to compensation on the basis of both the dual purpose and the mutual benefit doctrines. On March 3, 2011, the Labor and Industrial Relations Commission reversed the ALJ's award and entered its final award denying compensation. The Commission found that, because Wilson was on his way to go hunting for deer, there was no dual purpose or mutual benefit to his employer to make the accident compensable under the Missouri Workers' Compensation laws. Wilson appeals.

Our review of this matter is governed by section 287.495.1, RSMo 2000, which provides, in relevant part:

> Upon appeal no additional evidence shall be heard and, in the absence of fraud, the findings of fact made by the commission within its powers shall be conclusive and binding. The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:

---

5. White said that the job at Pin Oaks had already been set in place, that he had made a mistake in quoting it in his deposition testimony, and that he did not believe he mentioned it to Wilson but was not sure.

842

(1) That the commission acted without or in excess of its powers;

(2) That the award was procured by fraud;

(3) That the facts found by the commission do not support the award;

(4) That there was not sufficient competent evidence in the record to warrant the making of the award.

We review the Commission's award to determine whether it is "supported by competent and substantial evidence upon the whole record." Mo. Const. art. V, sec. 18. An award is supported by competent and substantial evidence unless it is against the overwhelming weight of the evidence. *Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 222–23 (Mo. banc 2003).

■ Wilson asserts three points of error in his appeal. First, he contends that the Commission incorrectly applied the dual purpose doctrine and the mutual benefit doctrine because the evidence established that he was injured during a trip motivated by business. Second, he asserts that the Commission's finding that he had deviated from his employment was contrary to the overwhelming weight of the evidence because the evidence established that Wilson's business objective had not been abandoned and that he had not engaged in any personal activity unrelated to his job at the time of his injury. Third, Wilson asserts that the Commission erred in finding that he had deviated from his employ-

ment because the Commission failed to consider that Wilson was acting for the mutual benefit of his business as he was in need of and was going to get gasoline for his vehicle to complete his business trip at the time of the accident. Because all of Wilson's arguments relate to the applicability of the dual purpose and mutual benefit doctrines, we address these issues in a combined matter.

■ For an injury to be compensable, the injury must arise out of and in the course of his employment. § 287.120.1, RSMo Cum.Supp.2010. "[T]he general rule is that an injury arises in the course of a claimant's employment if the accident occurs within the period of employment at a place the employee may reasonably be, while he is in furtherance of the employer's business or performing activities incidental to employment." *Gee v. Bell Pest Control*, 795 S.W.2d 532, 536 (Mo.App. 1990), *overruled on other grounds by Hampton*, 121 S.W.3d at 220. Injuries that occur while an employee is performing duties for the dual purpose of the employer and employee or for the mutual benefit of both, however, are compensable. *Otte v. Langley's Lawn Care, Inc.*, 66 S.W.3d 64, 70 (Mo.App.2001), *overruled on other grounds by Hampton*, 121 S.W.3d at 220. Wilson contends that his injury is compensable under the "dual purpose doctrine" or "mutual benefit doctrine." [6]

6. Wilson's injury occurred in December 2008, after the effective date of the substantial amendments to Missouri's Worker's Compensation Law enacted in S.B. 1, 93d Gen. Assem., 1st Reg. Sess., 2005 Mo. Laws 907. Among other things, those amendments provided for the first time that the provisions of the Worker's Compensation Law are to be strictly construed, § 287.800, RSMo Cum. Supp.2010; in addition, the 2005 amendments expressly "reject and abrogate earlier case law interpretations on the meaning of or definition of ... 'arising out of', and 'in the course of employment.'" § 287.020.10, RSMo Cum.Supp.2010. None of the caselaw cited in this opinion concerning the scope of the dual purpose and mutual benefit doctrines post-dates the 2005 amendments to the Act. The parties have not argued that the 2005 amendments should influence our analysis of Wilson's claims, and we therefore take no position on whether those amendments alter the dual purpose or mutual benefit doctrines as previously recognized by the courts.

■ "The mutual benefit doctrine applies if an employee is injured while engaging in an act that benefits both the employer and the employee and 'some advantage to the employer results from the employee's conduct.' " *Otte*, 66 S.W.3d at 70 (citation omitted). "Where travel is involved, this mutual benefit exception is known as the 'dual purpose doctrine' because the work of the employee creates a necessity for travel even though the employee may be serving some purpose of his own." *Medrano v. Marshall Elec. Contracting, Inc.*, 173 S.W.3d 333, 339 (Mo.App.2005). "The dual purpose doctrine recognizes 'that if the exposure to the perils of the highway is related to the employment even though the employment is not the sole cause of such exposure to such risks but is combined with or is a concurrent personal cause, the benefit of compensation is not to be withdrawn.' " *Id.* (citation omitted). "For the dual purpose doctrine to apply, the 'trier of fact must be able to infer the employee would have made the journey even though the private purpose was absent.' " *Otte*, 66 S.W.3d at 70 (citation omitted).

The evidence established, and the Commission found, that Wilson's trip began in Independence, Missouri, with the dual purpose of hunting and meeting with White of Iseman Mobile Homes in Chillicothe, Missouri, to discuss potential business. Wilson contends that the acceptance of this dual purpose finding "mandates the conclusion that the employment created the necessity for [his] travel," and, due to "the benefit to be derived by the employer, the intent to mix in a brief deer hunt is immaterial." Wilson argues that the trip to Chillicothe to meet with White would have been made even if there was no intent to hunt, and therefore, the dual purpose doctrine is satisfied.

■ Finding a dual purpose, however, is not the end of the issue in this case. "[F]or an accident to be compensable under the dual-purpose doctrine, an employee must be acting not only for his own purpose but for the purpose of his employer *when the accident occurs.*" *Parsons v. Kay's Home Cooking, Inc.*, 830 S.W.2d 46, 48 (Mo.App.1992) (emphasis added). "The doctrine does not apply when an employee deviates from an employer's business so that at the time of the accident he is serving only his own purpose."[7] *Id.*

7. Without explanation, Wilson contends that *Parsons* "represents a significant departure" from the Missouri Supreme Court's holding in *Corp v. Joplin Cement Co.*, 337 S.W.2d 252 (Mo. banc 1960). In *Corp*, the employee was involved in a fatal automobile accident while he was driving home on a Saturday after picking up construction supplies from his employer's place of business, which he was to deliver to a job site the following Monday. The Missouri Supreme Court held that "[t]he task assigned to [the employee] by his employer necessitated the trip to and from the company plant and, under the dual purpose doctrine, it is not a valid objection that the employee was concurrently serving a purpose of his own." *Id.* at 257. Moreover, the *Corp* court found that "the fact that [the employee] stopped at [a bar] and delayed his homeward journey for about forty-five minutes was [not] sufficient to constitute an abandonment of his employer's service and make the remainder of the trip strictly a personal one." *Id.* at 258. In this case, however, Wilson did abandon his employer's service by going hunting. Indeed, the *Corp* court noted that the employee was on a "direct" route necessary to the employer's purpose and need not made "any spatial deviation." *Id.* at 257, 258. The court distinguished cases where employees deviated from their routes for personal reasons and had not returned to the places where their duties required them to be. *Id.* at 257 (citing *Kinkead v. Mgmt. & Eng'g Corp.*, 103 S.W.2d 545 (Mo.App.1937) and *Duggan v. Toombs–Fay Sash & Door Co.*, 228 Mo.App. 61, 66 S.W.2d 973 (1933)). Thus, *Parsons* does not "represent a significant departure" from the court's holding in *Corp*.

The Commission found that, at the time of the accident, Wilson had deviated from his route to Iseman Mobile Homes in Chillicothe and was traveling to Francis's property where he planned to hunt. Thus, the Commission concluded that, at the time of the accident, Wilson was not on his way to Chillicothe. The Commission further concluded that, had Wilson cancelled his personal hunting trip, he would not have been where he was when the accident occurred. Substantial and competent evidence supported the Commission's findings and conclusions in this case.

"The test of when a deviation begins or terminates is not so much a matter of the time consumed and the distance traveled, but rests primarily on whether the employer's or the employee's purpose is being served." *Miller v. Sleight & Hellmuth, Ink Co.*, 436 S.W.2d 625, 628 (Mo.1969); *see also Smith v. District II A and B*, 59 S.W.3d 558, 565–66 (Mo.App.2001), *overruled on other grounds by Hampton*, 121 S.W.3d at 220. "When an employee abandons his employment and engages in work or pleasure purely his own, his employer is not liable for any accidental injuries sustained by the employee while so engaged because the accident does not arise out of and in the course of the employee's employment." *Smith*, 59 S.W.3d at 565. Whether Wilson "abandoned his personal mission and returned to the performance of the duties of his employer is a question of fact to be determined by the Commission." *Miller*, 436 S.W.2d at 628. The Commission found that, at the time the accident occurred, Wilson had deviated from his employment. Indeed, Wilson was going hunting, and, at the time the accident occurred, he "had not reached a point where his employment could be said to have been resumed." *Id.* at 629.

Wilson acknowledges that the Commission found that the sole reason Wilson was going to Francis's property was to hunt and that he had no intent to discuss business with Francis prior to the meeting with White at Iseman Mobile Homes. Wilson contends, however, that such finding "does not represent a reasonable inference drawn from the evidence, but rather it relies on surmise and conjecture." We defer to the Commission on determinations regarding weight of the evidence and the credibility of witnesses. *Bivins v. St. John's Reg'l Health Center*, 272 S.W.3d 446, 450 (Mo.App.2008). Although Morris said that Wilson intended to discuss business with Francis, Francis said that Wilson never once indicated that he desired to discuss any business matter with him either before or after his hunting trip. In addition, the Commission found that Francis was asleep on the morning of December 13 and noted that, had there been a plan to discuss business on that morning, Francis most likely would have been awake and expecting Wilson's arrival. Further, the Commission noted that, at the time of the accident, Wilson had not even secured the work from Iseman Mobile Homes. Thus, the Commission found that it was "more logical to conclude that [Wilson] was going to talk to Mr. Francis to be his escort driver after he was offered the work and knew the details for the Iseman Mobile Homes job." Given this evidence, we cannot say that the Commission based its finding upon "surmise and conjecture" but instead based it upon permissible inferences. "Where competent evidence or permissible inferences conflict, the choice rests with the Commission and is binding upon this court." *Id.* (citations and internal quotation marks omitted).

Wilson asserts that, because he had not yet been hunting, "there was no evidence that he had abandoned the business aspect of the trip." He contends that the evi-

dence established that he was still advancing toward his ultimate destination and that "[t]here was no deviation" because he was not "serving only his own purpose" when the accident occurred. Francis's testimony, however, refutes this contention. Francis said that Wilson telephoned him four times that Saturday morning before the accident telling him that he was lost and asking him for directions to Francis's farm property. Wilson was not asking for directions to Iseman Mobile Homes in Chillicothe. He was asking for directions so that he could go hunting. Moreover, although Chillicothe was to Wilson's *north* at the time of the accident, he had been travelling *east,* and then back *west,* on County Road 130 immediately prior to his injury. There was no reason for Wilson to be on County Road 130 *at all* in connection with his business trip to meet with White. We also note that Wilson had reached the intersection of County Road 130 and Highway 65 prior to his accident. Although Highway 65 would have provided Wilson with a direct route north to Chillicothe, he specifically turned *away* from that highway, in order to return west on County Road 130 to the Francis farm for his personal hunting errand. The evidence supports the conclusion that Wilson was on a significant spatial deviation from any reasonable route to Chillicothe at the time of his accident.

Wilson further claims that "[e]ven if it is determined that the trip to the Francis's property was completely unrelated to claimant's business interest, a denial of compensation is still not warranted." In support of this contention, Wilson cites *Spradling v. International Shoe Co.,* 364 Mo. 938, 270 S.W.2d 28 (1954). In *Spradling,* the Missouri Supreme Court upheld the Commission's award as supported by the evidence in the circumstances peculiar to the job duties of a traveling salesman. The court found

that, as a traveling salesman, the employee "was privileged to select his routes of travel and was not restricted to routes within his sales territory." *Id.* at 32. The court concluded that the employee's traveling to pick up his wife in Springfield, Illinois, which was outside his sales territory, constituted "such a slight deviation in choice of routes as to not affect the applicability of the Workmen's Compensation Law." *Id.* In this case, the peculiarities applicable to employment as a traveling salesman are not applicable. Moreover, Wilson was not merely deviating from the choice of routes; he was deviating from his employer's business by going hunting. Of greater importance is that the Missouri Supreme Court was affirming a determination made by the Commission itself which is entitled to deference by the reviewing court.

■ While particular deviations from a route which serves both personal and business purposes may be so slight as to be immaterial to the application of the mutual benefit doctrine, the evidence here supports the Commission's determination that Wilson's deviation was not minor. According to the evidence, Wilson intended to spend several hours hunting on Francis's property prior to his meeting with White. During that time, Wilson would presumably traverse fields or wooded areas, and climb into and occupy a deer blind, all while carrying a loaded firearm; depending on the circumstances, he might also have discharged and reloaded his rifle on one or more occasions. His personal mission also required Wilson to travel, in the dark, on gravel County Road 130, which presented its own risks (as Wilson's unfortunate accident demonstrates all too well). The Commission was justified in concluding that Wilson's multi-hour personal mission, which involved multiple features

which exposed him to risk of injury, did not represent merely "a slight deviation" from his employer's purposes, but a sufficiently substantial one that defeated his reliance on the mutual benefit doctrine.

As for the application of the mutual benefit doctrine, Wilson merely contends that the Commission failed to consider that he was acting for the mutual benefit of his business as he was in need of and was going to get gasoline for his vehicle to complete his business trip at the time of the accident. Although "an injury suffered by an employee while performing an act for the mutual benefit of the employer and the employee is usually compensable[,] . . . not every act of an employee that may result in a remote, attenuated or speculative benefit to the employer is compensable under the doctrine." *Blades v. Commercial Transp., Inc.*, 30 S.W.3d 827, 829 (Mo. banc 2000) (citation omitted). "The test is not whether any conceivable benefit to the employer can be articulated no matter how strained, but whether the act that resulted in the injury is of some substantive benefit to the employer." *Id.* at 831. "[T]he benefit cannot be so remote that it deprives the mutual benefit doctrine of meaning." *Id.* In this case, by the time Wilson became concerned that he was low on gasoline, he had already deviated from his employer's business to go hunting. The search for gasoline is a strained attempt by Wilson to articulate a conceivable benefit to his employer.

Wilson did not meet his burden of establishing that his injury arose out of and in the course of his employment. The Commission's decision that Wilson had deviated from his employment was supported by competent and substantial evidence and was not contrary to the overwhelming weight of the evidence. We, therefore, affirm the Commission's decision that Wil-

son is not entitled to workers compensation benefits.

All concur.