

# Missouri Court of Appeals
## Southern District
### Division Two

CARRIE CAMPBELL, widow of )
RICHARD CAMPBELL, )
)
    Claimant-Respondent, )
)
and )
)
RICHARD CAMPBELL, deceased, )
)
    Employee, )
)
v. )    No. SD34090
)
TREES UNLIMITED, INC., )
)    **Filed: Sept. 22, 2016**
    Employer-Appellant, )
)
and )
)
FIRSTCOMP INSURANCE COMPANY, )
)
    Insurer-Appellant. )

## APPEAL FROM THE LABOR AND
## INDUSTRIAL RELATIONS COMMISSION

## **AFFIRMED**

    Appellants Trees Unlimited, Inc. ("Employer") and FirstComp Insurance Company

("Insurer") appeal the final award of the Labor and Industrial Relations Commission ("the

1

Commission") awarding workers' compensation death benefits to Carrie Campbell ("Claimant"), the widow of Richard Campbell ("Employee"). *See* section 287.020.[1]

In April 2011, Employee was pronounced dead at the scene of a one-vehicle crash south of Joplin. Employee was the only occupant of the vehicle. Appellants assert the claim is not compensable because the following findings of the Commission were not supported by substantial and competent evidence upon the whole record: (1) "Employee was within the scope and course of employment at the time of" the accident (because the evidence did not show that Employee had arrived at his principal place of employment before the accident occurred); (2) the accident "was the prevailing factor for [Employee's] death" (because no "medical evidence addressed the exact cause of" Employee's death and no evidence established that his death resulted from "a hazard or risk related" to his employment); and (3) the defense of "an idiopathic condition" did not apply (because such a condition precipitating Employee's death was "the only conclusion" that could be reached).

Finding no merit in any of these claims, we affirm the award of the Commission.

**Applicable Principles of Review and Governing Law**

"We review the Commission's decision to determine whether it is supported by competent and substantial evidence upon the whole record." ***Kersey v. Autry Morlan, Inc.***, 388 S.W.3d 644, 648 (Mo. App. S.D. 2013); *see also* section 287.495.1(4). "'[C]ompetent and substantial evidence' is admissible evidence, to the extent it is believed or taken as true, tending to prove or disprove a material issue." ***Payne v. Thompson Sales Co.***, 322 S.W.3d 590, 592 (Mo. App. S.D. 2010). "An award that is contrary to the overwhelming weight of the evidence is, in context, not supported by competent and substantial evidence." ***Cardwell v. Treasurer of State of Missouri***, 249 S.W.3d 902, 906 (Mo. App. E.D. 2008).

---

[1] RSMo Cum. Supp. 2010. Unless otherwise stated, all statutory references are to RSMo 2000.

When reviewing a challenge to the sufficiency of the evidence, our task is to decide "whether the Commission could have reasonably made its findings and reached its result after considering all the evidence before it." *Kersey*, 388 S.W.3d at 648.  In accomplishing this task, we defer "to the Commission on issues involving the credibility of witnesses and the weight to be given to their testimony.  The Commission is free to believe or disbelieve any evidence." *Porter v. RPCS, Inc.*, 402 S.W.3d 161, 171 (Mo. App. S.D. 2013) (citations omitted).  Thus, competing expert witness opinions present a question of fact for the Commission to decide. *Roberts v. Mo. Hwy. & Transp. Comm'n*, 222 S.W.3d 322, 333 (Mo. App. S.D. 2007).  Here, the Commission adopted the findings and decision of the administrative law judge ("ALJ"), which we review as a part of the Commission's final award. *Kersey*, 388 S.W.3d at 647-48.

While an employer must provide compensation as provided under Chapter 287 for the "death of the employee by accident arising out of and in the course of the employee's employment," section 287.120.1, RSMo Cum. Supp. 2010, the claimant bears "the burden of proving all essential elements of his claim." *Kersey*, 388 S.W.3d at 648.  Questions regarding "causation and work-relatedness are questions of fact to be decided by the Commission." *Id.* at 649.

**Evidentiary and Procedural History**

At a July 2014 evidentiary hearing on the claim, the ALJ received live testimony, deposition transcripts, and various exhibits.  The following summary of the evidence relevant to the points on appeal is taken from these materials.  At the commencement of the hearing, the ALJ stated as follows the issues to be decided, and the parties' attorneys agreed.

> The issues for resolution and the only issues for which evidence will be taken are, one, whether [Employee] sustained an accident which arose out

3

of and in the course and scope of the employment; and, two, whether the accident caused the injuries and disabilities for which benefits are being claimed or whether it was caused by an idiopathic condition.

Whether the accident presented a hazard of employment that Employee would be equally exposed to outside of his work was not expressly raised to the ALJ as an issue to be decided, and the parties were directed to "confine [their] evidence to the issues presented."

Claimant testified that she had been married to Employee for "[a]lmost 35 years[,]" and they lived in Carthage. Employee started Employer as a wholesale lumber business in 1986, and at the time of the accident, Employer was located in Joplin on FF Highway. Another employee, William Griffiths, testified that he had worked for Employer for about 24 years, and Employee was both the boss and a salesperson for Employer. Employee was "generally a healthy guy" who had not complained about chest pains or heart problems.

In 2007, both Employee and Claimant had a "noninvasive" angiogram at a local hospital because Employee was on the hospital board, and board members were given an opportunity to be tested on what was then a new piece of equipment. Claimant did not know of any heart problems or history of strokes for Employee. Employee's last doctor appointment was in January 2010, and Claimant had not observed any change in Employee's health since that time. Employee had high cholesterol, but medicine was not prescribed to treat it. Claimant did not know Employee to have dizzy or fainting "spells[.]" Employee was physically active in gardening, golfing, and hunting.

Employee kept regular work hours, and at "around 8:30, 8:45," he would go to "the post office in Carthage" to collect Employer's mail and then go on to work. Occasionally, Employee played golf during the work week with a customer or at a sponsored charity

4

event, and he sometimes attended a board meeting.  If Employee "was going to take time off and do something other than work" it was "his custom and practice" to tell Claimant.

Mr. Griffiths testified that Employer purchased lumber from "mills all over the country" to sell to other businesses within about a 2-hour driving or 120-150 mile radius of Joplin, including businesses south of Joplin, through Neosho, and into northwest Arkansas. Employee did "research out of the office related to competitors[,]" and he visited customers and potential customers.  Mr. Griffiths was familiar with Employee's routine, which was to work primarily from 9:00 a.m. to 5:00 p.m., Monday through Friday, and it was uncommon for Employee "to take personal time off during the workday . . . . unless it was an event" such as "a Chamber of Commerce golf outing" or something else that was "known." Employee commonly traveled away from the office for work and went into the office "at some point each day."  It was not "unusual for [Employee] to work out of the office in the morning and then come in to the office around midday or in the afternoon[.]"

Employee drove an Employer-owned Ford F-150 truck ("the truck") for his work. Employer paid the taxes, insurance, maintenance, and gas for the truck.  Employee drove a "Lariat" truck as his personal vehicle.

During the work day, Employee "call[ed] on customers[,]" drove "by lumberyards to see what they were buying[,]" and offered deals on lumber to customers.  Mr. Griffiths also expected Employee to have business phone calls with a lumber supplier.  If Employee was away from the office in the morning, he would call Mr. Griffiths to get information about the bank balances for the day and other business matters.  It was uncommon for Employee to call in such a manner for personal reasons.

5

Employee and Claimant owned a farm southeast of Employer's office. When Employee traveled north from Neosho to the farm, he would "always go on 59 Highway North" instead of Highway 71. Claimant knew of no reason why Employee would have gone to the farm on the day of the accident. The couple also owned about 1,100 acres with another couple near Bull Shoals Lake ("the lake property"). To get there, they would have used Interstate Highway 44 and Highway 65.

Claimant recalled that she and Employee were interested in selling the lake property, and there had been some discussions with a developer about his interest in developing some of that property. The developer was regarded as "a prospective customer" because Employer "could have sold lots and lots of lumber and building materials to [the developer for] his development of the piece of property."

Mr. Griffiths and Employee played 18 holes of golf on the Saturday before the Monday accident. They did not use a cart, and Employee did not complain at any point about not feeling well.

On the morning of the accident, Claimant left home around 6:30 a.m. to babysit her granddaughter at the child's home, which was in Carthage. Claimant then called Employee and asked him to drop off some juice for their granddaughter as it was right "on his way to the post office." Employee brought the juice by at around 8:30 or 8:45 and visited for "10 or 15 minutes" before leaving. Nothing seemed unusual about his health and nothing unusual happened.

Claimant identified calls in telephone records from the day of the accident made between Employee's phone and her phone, as well as one 9:10 a.m. call involving Employee's sister's telephone. Employee was not playing golf that day because his clubs

6

were in the garage. Claimant testified that Employee did not have any family or friends in the area of the accident. She could not "think of any reason other than business reasons that would explain [Employee's] presence on a Monday morning, during normal work hours, about 7 miles from his business office[.]" It "would have been very, very uncommon" for Employee to "just take the morning off and goof off[.]"

Mr. Griffiths testified that on the morning of the accident, Employee had not mentioned "any personal activity or errands that he was going to do that day[.]" If Employee was going to do something "like play golf during the weekday or some other personal activity," he would normally inform Mr. Griffiths in advance. Employee had not yet brought the mail into the office that morning.

Mr. Griffiths identified phone calls in telephone records for the morning of the accident that involved Employee's business phone and telephone numbers associated with: a developer who was a "potential customer" (four calls between 7:44 and 10:27 a.m.); a lumber supplier at 8:19 a.m.; and Employer's office (five calls that occurred between 8:39 and 11:01 a.m).

Mr. Griffiths testified that the accident occurred "about 7 ½ miles" south of Employer's office on the route that was the easiest to travel between the office and customers located in Neosho and northwest Arkansas. Claimant testified that based on the location of the accident, she thought Employee was "traveling in a northerly direction toward [Employer's] office[.]"

A witness to the accident, Charles Ramsey, testified by deposition that around lunchtime on the day of the accident, he was traveling north on Highway 71,[2] a divided highway, in the right lane of traffic, south of Joplin and south of I-44. The weather was

_____
[2] There was testimony that this portion of roadway was renamed as Highway 49 sometime after the accident.

7

clear and sunny. He was traveling about "70 miles an hour[,]" which he believed to be the speed limit. The brake lights of "a semi" directly in front of him came "on a couple times just briefly." He then saw the truck, which had been traveling in front of the semi, "move to the left lane, the passing lane[.]" The truck then "drove into the median, almost like it was intentional, just kind of a gradual move into the median and driving straight through the median" dividing the north and south lanes of traffic. He "saw no brake lights at all on the [truck]." The truck continued "straight northbound in the middle of the [grass] median" without swerving or any sign of activated brake lights, and it appeared to be maintaining the same rate of speed. Next, he "saw a puff of dirt, smoke, and [he] saw the vehicle launch into the air" between the two bridges for the north and south lanes of highway traffic. The truck disappeared from view.

Mr. Ramsey was "stunned[,]" and he drove into the median, staying away from the truck's tracks, and "pulled up to the area where it left the ground and then went down into the ravine and stopped." He saw that the truck had landed on the other side of the embankment beneath the bridge. He called "911" immediately. Mr. Ramsey thought the operation of the truck was consistent with someone who had fallen asleep, became unconscious, or "maybe had a heart attack[,]" but he could not see the driver before the truck disappeared from his view.

Missouri State Highway Patrol Sergeant Michael K. Frazier testified by deposition that he responded to the accident scene within ten minutes of being dispatched. He found Employee inside the truck and believed him to be deceased. The sergeant observed that Employee's right arm "was very close to being amputated or severed[,]" but "there was a very small amount of blood[.]" Sergeant Frazier had worked as "an EMT" for about four

8

years before working as a trooper for twenty years. He had "work[ed] numerous fatality accidents and injury accidents[,]" and he "would have expected more blood" if Employee had "been living at the time this injury occurred[.]" Based upon that observation, the path of the truck, and the appearance that the truck had maintained its speed until it left the ground, the sergeant "felt that [Employee] was probably unconscious or deceased at the time."

However, Sergeant Frazier understood that it is "fairly common on a high speed . . . frontal impact for a driver to have an aortic tear due to the fact that they [sic] come to such an abrupt stop, and it's usually the descending aorta that comes off the back of the heart." The sergeant testified (without objection) that if Employee's aorta had been completely severed, then "[t]here would have not been any blood flow to any limb[,]" and this could explain "why [he] did not see more blood from the severed limb[.]"

Sergeant Frazier determined that the left front tire of the truck entered the grassy median about 64 feet before the right tire did so, suggesting that the truck had "a gradual runoff" from the paved highway. There were two sets of "rumble strips[,]" "both on the shoulder and on the fog line" along the inside edge of the highway. The truck was fully in the median before reaching the guardrail on the left side of the north-bound highway closer to the bridge. The truck traveled about 337 feet from the point that the left front tire entered the median to the point of a small embankment just before the edge of the cliff that dropped into the creek below. Sergeant Frazier opined that the truck had crossed the creek "airborne" for about 184 feet, then violently struck "a very steep embankment" on the other side, flipped, "slid back down the steep embankment underneath the bridge" and came to a rest upside down.

The Newton County deputy coroner, Lee Ireland, testified by deposition that when he arrived at the accident scene, Employee was deceased. Mr. Ireland transported Employee's body to the funeral home. An autopsy was not performed. Mr. Ireland's examination revealed that Employee's "chest was totally broken[,]" and he described a chest in such a condition as "feel[ing] like Jell-O when you push on it." It was apparent to Mr. Ireland "that there was internal organ damage" because the sternum felt crushed, the ribs felt as though they had been torn loose, and there appeared to be no support for the chest. He "drew a toxicology sample" from Employee's body and it was reported as "negative for all tests except for caffeine." The coroner's report stated the cause of death as "[b]lunt force trauma to the chest and head due to single vehicle accident." Mr. Ireland had "no idea whether [Employee] was dead at the time that he hit [sic] or how long he survived afterwards[,]" but he knew that the accident would have been "sufficient to cause death[.]"

Employee was 57 at the time of his death. Claimant recalled that no mail was found in the truck after the accident, and Employee's cell phone was not recovered.

An accident reconstruction expert, Dr. Bruno Schmidt, testified on behalf of Claimant that the reaction time of "an alert driver" is about 1.6 seconds to just hit the brakes, but it takes even longer to "turn his wheel and get back up on the highway." Additionally, there was a dip in the median "that would cause [Employee] to go off to his left." Once the truck was in the median, Employee would have had about 1.5 seconds to get back on the highway before guardrails on that side of the highway would have prevented re-entry. Employee likely would not have wanted to move over toward the left side of the median because traffic there was traveling in the opposite direction, and there was a concrete bridge abutment on that side. And from Employee's vantage point in the median, the drop-off into

10

the creek was not visible. "So the only reasonable path for him to follow would be to simply go on down the median." "[B]y the time his left tire was in the median . . . he had about 3.3 seconds before [the truck] launched off of the embankment[.]"

A mechanical engineering consultant, Stephen Philip Buckley, testified on behalf of Appellants that, based on his evaluation of the accident report and information from his site visit, the median was much lower in the center, similar to a gutter in a bowling alley. He also determined that from when the truck first entered the median, there would have been 3.34 seconds before it launched from the embankment. He opined that the truck was traveling 68.5 miles per hour "when it left the edge of the cliff and went airborne[,]" and, based upon the truck's movements, the cruise control was engaged when this happened.

A biomechanics expert, William Nelson, testified on behalf of Appellants. He did not challenge Mr. Schmidt's opinion concerning a reaction time of 1.6 seconds, but he thought that Employee "would have had two to three times that amount of time to have taken some type of corrective action[.]" He also testified that "a rumble strip is basically to get your attention for [sic] both a combination of vibration and . . . the sound that you hear when you drive over the rumble strips." He opined that rumble strips were "very effective" in curtailing "drivers who either are inattentive or who have dozed off" from drifting off the road.

A critical care and emergency room physician, Dr. Kenneth A. Stein, testified on behalf of Claimant via deposition that his review of an accident report, medical records, photos, and deposition transcripts led him to opine that Sergeant Frazier "did not have enough information" to conclude that Employee "had died prior to impact." Dr. Stein testified that the accident may have torn Employee's aorta, crushed his heart, squeezed his

11

heart resulting in "a fatal arrhythmia[,]" or forced a rib to puncture his heart. Any of these things would have stopped blood from going to his arm. Dr. Stein explained that the body travels at the same speed as the vehicle, but when a vehicle traveling 70 miles per hour comes to an abrupt stop, the body is still traveling at 70 miles per hour. Employee's "chest went in to and smashed in to the steering column, steering wheel of the car leading to major injuries to his chest as well as partly severing his arm."

Dr. Stein opined that "[w]ithin a reasonable degree of medical certain [sic] [Employee] died because of the consequences of the extreme trauma that his chest endured during the accident." Dr. Stein also testified:

> There is no evidence from [Employee's] previous medical history that at this particular point in time he would have had any sudden medical event that happened. There's no evidence that he would have had a heart attack, he had a CT and angiogram of his chest a few years earlier . . . to see if there's any evidence of any narrowing in the coronary arteries of the heart, there were not any although it's possible that someone could have a heart attack even though they had a CT angiogram four years ago, it would be very unlikely and in all reasonable probability within a certain degree of, with a reasonable degree of medical certainty he did not have a heart attack.

Dr. Stein's review of Employee's medical records indicated no history of heart disease, seizure, stroke, or "any condition" suggesting that he experienced "a sudden onset medical event that would have incapacitated him prior to impact[.]" It would not be proper for him to speculate that Employee "died beforehand" because while "everything's possible[,]" it was "not likely" that he "had a fatal heart arrhythmia beforehand," and there was "no obvious . . . thing that would put him at [sic] major risk for having something beforehand."

A report prepared by forensic pathologist, Dr. Erik Krag Mitchell, was admitted as evidence on behalf of Appellants, and it concluded that "a deciding factor in [Employee's] terminal crash" was his medical or mental incapacitation. Dr. Mitchell testified at the

12

hearing that he reviewed photos, medical records, an accident report, and some deposition transcripts associated with the case before concluding that he did not "have an opinion as to the cause of death. There wasn't enough information." He disagreed with Dr. Stein's opinion "that there was no evidence that [Employee] would have a heart attack[,]" and he would add "heart attack, seizure, or other idiopathic event" as possible causes of Employee's injuries. Dr. Mitchell testified that Employee had "a typical American lipid profile which places him into the risk of sudden cardiac arrest." He also thought that a "potential explanation" for what happened would be anything limiting Employee's "ability to react[.]" He agreed that "the one thing we do know to a reason [sic] degree of medical certainty is that the injuries that he suffered in this crash were sufficient to cause his death[.]"

The ALJ found that Claimant "sustained [her] burden of proving [Employee] was in the course and scope of his employment at the time of the motor vehicle accident" and was entitled to receive weekly death benefits and funeral expenses. The ALJ based this finding on the following supporting facts:

> [Employee] was at the place and at a time he was reasonably supposed to be. He was driving a company vehicle a few minutes before noon on a Monday. He was driving towards his office from the area in which he normally called on clients and checked inventory at various locations. He had been on the phone with his office and with clients all morning. There is no evidence showing he was on any kind of deviation or establishing a distinct departure personal errand.

The ALJ also addressed "[w]hether the accident caused the injuries and disabilities for which benefits are being claimed, or whether it was caused by an idiopathic condition." The ALJ reasoned:

> There is no evidence to conclude that [Employee] died from any cause other than the traumatic crushing injuries to his chest. [Insurer] has argued an idiopathic cause must have caused [Employee] to die of unrelated reasons and this actually caused the motor vehicle accident. [Appellants']

13

own expert, Dr. Mitchell, testified that it would be speculation. I find that evidence supports the opposite. [Employee] was in good health, was very active, and had not indicated to anyone that he was having any sort of medical complaint.

Further, the ALJ found that Dr. Stein opined, "to a reasonable degree of medical certainty, the injuries [Employee] sustained were a sufficient trauma to cause his death[,]" and Dr. Mitchell agreed with this opinion. The ALJ rejected "that the lack of blood loss from the arm wound is evidence that [Employee's] heart was not beating at the time of the impact." The ALJ credited Dr. Stein's "explanation that the damage to [Employee's] chest was sufficient to stop his heart from beating and therefore prevent his arm from bleeding for several reasons."

Appellants' "**APPLICATION FOR REVIEW**" claimed errors in the ALJ's findings that: (1) Employee "was within the course and scope of employment at the time of the motor vehicle incident" because he had not performed work that morning and "was still in transit between his home and the principal place of employment" when the accident occurred; (2) Employee's "death was from the motor vehicle accident, rather than an idiopathic condition which had incapacitated him prior to the truck driving off the cliff"; and (3) Employee's "death was the cause [sic] of the accident, despite clear and convincing evidence . . . that [Employee] . . . was incapacitated and precluded from taking any evasive action prior to the accident and, therefore, was the cause of the accident." Appellants timely appealed the Commission's final award affirming and incorporating the ALJ's decision.

**Analysis**

*Point 1*

Appellants' first point challenges the Commission's factual finding that Employee was within the scope and course of his employment at the time of the accident, claiming that

14

substantial and competent evidence did "not show that Employee had arrived at the principal place of employment" before the accident happened and that the final "[a]ward disregarded the provisions of [section] 287.020.5."[3]  Based upon other portions of Appellants' brief, we understand the statutory reference to be in support of Appellants' argument that "uncontroverted evidence shows that [Employee] had left his home on the morning of [the accident], and was on his way to his principal place of business, but never did arrive."[4]

"An injury is 'in the course of' the employment when it occurs within the period of employment at a location where employee would reasonably be while engaged in fulfilling the duties of employment or something incidental thereto." *Simmons v. Bob Mears Wholesale Florist*, 167 S.W.3d 222, 225 (Mo. App. S.D. 2005).  "Injuries that occur while an employee is performing duties for the dual purpose of the employer and employee or for the mutual benefit of both, however, are compensable." *Wilson v. Wilson*, 360 S.W.3d 836, 842 (Mo. App. W.D. 2011).  This principle does not apply if the employee so deviates from the employer's business that the employee "is serving only his own purpose." *Id.* at 844 (internal quotation omitted).  "Each case must be decided on its own facts and

_____

[3] Section 287.020.5 provides:

> Injuries sustained in company-owned or subsidized automobiles in accidents that occur while traveling from the employee's home to the employer's principal place of business or from the employer's principal place of business to the employee's home are not compensable.  The extension of premises doctrine is abrogated to the extent it extends liability for accidents that occur on property not owned or controlled by the employer even if the accident occurs on customary, approved, permitted, usual or accepted routes used by the employee to get to and from their place of employment.

[4] A contention that the Commission misinterpreted or misapplied section 287.020.5 would be a distinct claim of legal error requiring a separate point relied on and development of an argument based on what would be an issue for our *de novo* review.  *Cf. Ivie v. Smith*, 439 S.W.3d 189, 199 n.11 (Mo. banc 2014) ("a substantial-evidence challenge, a misapplication-of-law challenge, and an against-the-weight-of-the-evidence challenge . . . . are distinct claims" that must be raised "in separate points relied on . . . to be preserved for appellate review"); *Henson v. Henson*, 195 S.W.3d 479, 483 (Mo. App. S.D. 2006) ("[a] submission of error without reasoned argument does not allow the reviewing court to make a decision"); *Maxon v. Leggett & Platt*, 9 S.W.3d 725, 729 (Mo. App. S.D. 2000) (*overruled on different grounds by Hampton v. Big Boy Steel Erection*, 121 S.W.3d 220, 223, 224 (Mo. banc 2003)) (decisions regarding "interpretations or applications of law . . . are reviewed for correctness without deference to the Commission's judgment").

15

circumstances," *Simmons*, 167 S.W.3d at 225, and whether "a distinct departure on a personal errand is shown" is "a question of fact for the Commission." *Doerr v. Teton Transp. Inc.*, 258 S.W.3d 514, 523 (Mo. App. S.D. 2008) (internal citations and quotations omitted).

Appellants argue that Employee's reason for being south of Employer's office at the time of the accident "is without explanation[,] calls for speculation[,]" and is distinguishable from a case relied upon by the Commission -- *Harness v. Southern Copyroll, Inc.*, 291 S.W.3d 299 (Mo. App. S.D. 2009). The employee in *Harness* had been sent from his usual employment at one of the employer's locations to work at another company owned by the owner of the employer. *Id.* at 302. The location of the fatal accident was on a route from the other company toward both the employee's usual assignment at employer's location and the employee's home. *Id.* The employer and insurer contended that the substantial and competent evidence did not support that the "car accident arose out of and in the course of employment" because the "[e]mployee was not fulfilling any job duties for the [e]mployer and was on his way home when the accident occurred." *Id.* at 305.

This court acknowledged the general rule that an accident occurring while an employee is going to and from work is not compensable, but we also noted that under "the *Reneau* doctrine, . . . an employee whose work entails travel away from the employer's primary premises is held to be in the course of employment during the trip, except when on a distinct personal errand." *Id.,* referencing *Reneau v. Bales Elec. Co.*, 303 S.W.2d 75, 79 (Mo. 1957). Apart from the specific statutory exception in section 287.020.5 regarding travel between the employee's home and the employer's principal place of business, "the *Reneau* doctrine remains in effect to allow compensation." *Harness*, 291 S.W.3d at 305.

16

We affirmed the benefits award in ***Harness*** because the employee was to be paid mileage between the two work locations, he remarked to a coworker shortly before the accident that he was going to stop by the place of his usual assignment before going home, and the employee's wife knew of no reason why the employee had to come straight home that day. *Id.* at 306.

Appellants are correct in arguing that some of the facts in ***Harness*** are distinguishable from the instant case, but their argument "that at no time did [Employee] reach the principal place of employment since leaving home that day[,]" is not outcome-determinative. While it is true that the employee in ***Harness*** worked at two specific locations, the location of Employee's work in this case was not so fixed, and substantial and competent evidence supported the Commission's findings that Employee was where he "was reasonably supposed to be" at the time of the accident as his work included calling on clients in a particular area, "check[ing] inventory at various locations[,]" and using his phone to remain in contact "with his office and . . . clients[.]"

Employee was both the boss and a salesperson, and the accident occurred in an area where he "would reasonably be while engaged in fulfilling the duties of employment or something incidental thereto." ***Simmons***, 167 S.W.3d at 225. Employer's territory stretched south past Joplin into northwest Arkansas, and Employee personally visited locations of customers and competitors in those areas. Employee drove a different vehicle as his personal vehicle, the truck and gas used for Employee's work travel was supplied by Employer, and Employee was operating his work vehicle at the time of the accident. It was common for Employee "to work out of the office in the morning" before going to "the office around midday or in the afternoon[,]" and Employee stayed in contact with Employer's

17

office and tended to other businesses by cell phone.  His cell phone records corroborated calls between Employee and Employer's office, a lumber supplier, and a real estate developer who was also a potential customer.  Even if Employee was motivated by his desire to sell his own land to the developer, there was competent evidence of at least an "incidental" connection between this sale and future lumber sales to the real estate developer.  *See Simmons*, 167 S.W.3d at 225.  Moreover, even if the Commission concluded that the calls to the developer or sister were personal in nature, the Commission did not have to find that the calls were such a deviation that they constituted an abandonment of Employer's purposes.  *See Wilson*, 360 S.W.3d at 842.

Thus, the Commission did not have to find that, at the time of the accident, Employee was simply on his way to work just because he had not yet arrived at Employer's office.  The first part of the *Reneau* doctrine, as explained in *Harness*, applies here: substantial evidence indicated that Employee's "work entail[ed] travel away from the [E]mployer's primary premises" such that Employee was "in the course of employment during the trip[.]"  The relevant question then becomes whether Employee was "on a distinct personal errand" at the time of the accident such that he would be excluded from eligibility for compensation.  *Harness*, 291 S.W.3d at 305.  In other words, was Employee "engaged in fulfilling the duties of employment or something incidental thereto[,]" *Simmons*, 167 S.W.3d at 225, or had he left dual employer-employee purposes to exclusively serve his own purposes at the time of the accident?  *See Wilson*, 360 S.W.3d at 844.

Appellants' argue that "there is no evidence that [Employee] performed any work on the day of the accident[.]"  This argument ignores reasonable inferences from the evidence that the Commission was entitled to credit.  "Claimant did not have to *absolutely* establish

the essential elements of her case; it is sufficient if she shows them by a reasonable probability. 'Probable' means that it appears to be founded in reason and experience which inclines the mind to believe, but leaves room for doubt." ***Ellis v. Mo. State Treasurer***, 302 S.W.3d 217, 224 (Mo. App. S.D. 2009) (internal citation and quotations omitted) (emphasis added).

Mr. Griffiths testified that the accident occurred "about 7 ½ miles" south of Employer's office on the easiest route to travel between the office and Employer's customers in Neosho and northwest Arkansas. Employee had not informed Mr. Griffiths that he would be engaged in personal activities on the morning of the accident, something that Employee would normally tell Mr. Griffiths if it were to be the case. Claimant also testified that it "would have been very, very uncommon" for Employee to have simply "take[n] the morning off [to] goof off[.]" While he sometimes "play[ed] golf during normal business hours[,]" his golf clubs were in the garage on the day of the accident, and he would have told Claimant if he had a board meeting to attend. Claimant testified that Employee was not on the route he would have used to either visit the couple's farm or the lake property.

The Commission could reasonably conclude from the evidence presented that Employee had not so abandoned Employer's purpose as to be serving solely his own purpose at the time of the fatal accident. Point I is denied.

### Points 2 & 3

Appellants' second and third points address the application of section 287.020.3(2) and (3) to Employee's fatal injuries. The pertinent part of this section provides:

> (2)     An injury shall be deemed to arise out of and in the course of the employment only if:

(a)     It is reasonably apparent, upon consideration of all the circumstances, that the accident is the prevailing factor in causing the injury; and

(b)     It does not come from a hazard or risk unrelated to the employment to which workers would have been equally exposed outside of and unrelated to the employment in normal nonemployment life.

(3)     An injury resulting directly or indirectly from idiopathic causes is not compensable.

Point 2 improperly contains separate challenges that respectively implicate subsections (2)(a) and (2)(b):  (1) a challenge to the Commission's factual finding that the accident caused Employee's death; and (2) a claim that nothing in the record demonstrated that the accident was a "hazard of employment . . . that [Employee] would not be equally exposed to in his non-employment life."  *Cf. **Waller v. A.C. Cleaners Mgmt., Inc.***, 371 S.W.3d 6, 11 (Mo. App. E.D. 2012) ("separate errors should be set out in separate points"). But because the "equal risk" issue from section 287.020.3(2)(b) was not presented to nor decided by the ALJ, and Appellants did not include this issue in their appeal to the Commission, we must ignore that portion of the claim.  Issues "presented to this Court for the first time on appeal" are not preserved for review and may not be litigated before this court.  ***Spradling v. Treasurer of State***, 415 S.W.3d 126, 134 (Mo. App. S.D. 2013); ***Archer v. City of Cameron***, 460 S.W.3d 370, 377 (Mo. App. W.D. 2015).

Appellants' remaining Point 2 claim is that even if the accident occurred while Employee was in the course of his employment, the accident was not "shown to be the prevailing factor for his death[.]"  Point 3 goes one step further and contends that even if the accident was the prevailing factor in Employee's death, "the claim should still be denied, due to the fact that the death of [Employee] is a result more likely than not of an idiopathic

20

condition" such that the rejection of this defense was "not supported by substantial and competent evidence."

Appellants acknowledge that they had the burden to prove that an idiopathic condition caused the injury, but they contend that they did so with "overwhelming" evidence. Idiopathic means "'peculiar to the individual, innate[.]'" *Ahern v. P & H, LLC*, 254 S.W.3d 129, 133 (Mo. App. E.D. 2008) (affirming the denial of a worker's compensation claim based upon a seizure being an idiopathic cause); *cf. Taylor v. Contract Freighters, Inc.*, 315 S.W.3d 379, 382-83 (Mo. App. S.D. 2010) ("that a cough is an idiopathic condition strains beyond recognition the definition of idiopathic condition"). At the heart of Appellant's argument is their position that Dr. Stein's testimony did nothing to rebut their contention that "the only rational explanation as to the lack of evasive action was a medical incapacitation or death." The assertion overlooks Dr. Stein's testimony regarding the cause of death, as well as the Commission's general ability to judge witness credibility, *Porter*, 402 S.W.3d at 171, and its specific ability to decide between conflicting expert opinions. *Roberts*, 222 S.W.3d at 333-34.

In support of Appellant's position, Mr. Buckley opined that the cruise control was engaged when the truck went off the cliff. Mr. Nelson concluded that Employee would have had 3.2 to 4.8 seconds to take corrective action. Dr. Mitchell testified that Employee's medical or mental incapacitation was "a deciding factor" in the accident, and he disagreed with Dr. Stein on the likelihood of an incapacitating event.

But the following evidence supported the decision of the Commission. Dr. Schmidt testified that even an alert driver needs 1.6 seconds to brake and even more time to do something like steer back up onto the highway, and Employee only had about 1.5 seconds

21

after he was in the median to do this before the highway guardrail would have prevented him from getting back up onto his side of the highway. Added to this would be the concern of an alert driver to avoid oncoming traffic on the other side of the highway, and an inability from within the median to perceive the approaching drop-off. And Dr. Stein testified that he found nothing in Employee's medical history indicating that he suffered "a sudden onset medical event that would have incapacitated [Employee] prior to impact[.]"

Both Dr. Stein and Dr. Mitchell agreed that Employee's injuries in the accident were sufficient to cause his death, but they differed in their assessment of some unknown medical event that might have caused Employee to become incapacitated before the truck left the roadway.

"It is not the function of an appellate court to decide afresh what weight ought to be given to conflicting medical opinions on causation." *Roberts*, 222 S.W.3d at 333. The Commission clearly rejected the affirmative defense of an idiopathic condition, and it was entitled to do so based upon the testimony of Dr. Stein that there was no medical evidence that Employee experienced any "sudden medical event" that would have caused incapacitation before the crash and no medical evidence that Employee was peculiarly susceptible to a sleep or other inattentive disorder that could have caused the crash.

Points 2 and 3 are also denied, and the final award of the Commission is affirmed.

DON E. BURRELL, P.J. – OPINION AUTHOR

GARY W. LYNCH, J. – CONCURS

WILLIAM W. FRANCIS, JR., J. – CONCURS